IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| **Cara Williams, Johnita Slaughter, Mandre Miller, James Collier, Teresa Jones, Chance Kenyon, Anthony Williams, Dwann Jones and LeRoy Fields-Campbell,** individually and on behalf of a putative class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>**Wells Fargo Bank, N.A.**,<br><br>Defendant. | Case No.  4:15-cv-000038<br><br><br>**Defendant Wells Fargo Bank, N.A.'s Statement of Undisputed Material Facts in Support of Its Motion for Summary Judgment** |

Defendant Wells Fargo Bank, N.A.  ("*Defendant*" or "*Wells Fargo*"), pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56, submits its Statement of Undisputed Material Facts in Support of Its Motion for Summary Judgment.

*Introduction*

The term "*App.*" below refers to the Appendix that Wells Fargo contemporaneously is filing as part of its Motion for Summary Judgment papers pursuant to Local Rule 56(e), with references to the specific pages in that Appendix as required by that same local rule.  Use of the term "*Ex.*" below refers to the lettered exhibits included in the Appendix.

Citations to documents using the prefix "*PL*" relate to records Plaintiffs produced in discovery or records that were produced by the plaintiff in *Eggers v. Wells Fargo Bank, N.A.*, Case No. 4:14-cv-00394, and designated as usable in this case, subject to admissibility objections, and pursuant to the protective orders entered in each case on June 15, 2015.

Citations to documents using the prefix "*WF*" relate to records Wells Fargo produced in discovery in this and/or the *Eggers* case and usable in this case, subject to admissibility objections, and pursuant to the protective orders entered in each case on June 15, 2015.

Additionally the summary judgment record in this case includes excerpts of depositions and declarations from this and the *Eggers* cases that the protective orders contemplated could be used interchangeably in the cases, again subject to admissibility objections.

Exhibits filed under seal may include criminal history records information covered by orders on confidentiality entered by this Court in this and the *Eggers* cases.

*Statements of Undisputed Material Fact*

Wells Fargo admits the following facts for the purpose of this motion for summary judgment only, and asserts the facts set forth below were derived by viewing the record in the light most favorable to Plaintiffs and giving them all reasonable inferences, as the Rules require.

**A.      *Wells Fargo***

1.      Wells Fargo is a national bank chartered under the National Banking Act and regulated by the Office of the Comptroller of the Currency ("*OCC*") with deposits insured by the Federal Deposit Insurance Corporation ("*FDIC*").  *See* Fourth Amended Complaint, Docket No. 55 ("*FAC*") at ¶ 16, Ex. 1, App. 2; Wells Fargo & Company SEC Form 10-K, for fiscal year ending December 31, 2012, Ex. 2, App. 34.

2.      Wells Fargo provides retail, commercial and corporate banking services through banking stores and offices, the internet, and other distribution channels to individuals, businesses, and institutions in all 50 states and the District of Columbia.  *See* Ex. 2, App. 33.

3.      Wells Fargo Home Mortgage (*"WFHM"*) operated as a division of Wells Fargo at the times material to this lawsuit.  The WFHM line of business included mortgage origination

and servicing.  Declaration of Peter DeLanoit, dated January 28, 2016, bearing the *Eggers* case caption at ¶ 3, Ex. 3, App. 51.

**B.     *Section 19 and the Regulatory Environment Affecting Wells Fargo***

4.      Wells Fargo's banking operations are subject to regulation and examination by the OCC and the FDIC as well as by the Federal Reserve Board ("*FRB*"), the Consumer Financial Protection Bureau ("*CFPB*"), the Securities and Exchange Commission, and the Commodities Futures Trading Commission.  *See* Ex. 2, App. 34–39.

5.      Wells Fargo understands that among other things the FDIC may terminate a depository institution's insurance upon a finding that it violated any applicable rule, regulation, order, or condition.  *See* Ex. 2, App. 39.

6.      As an FDIC-insured depository institution, Wells Fargo seeks at all times to comply with 12 U.S.C. § 1829, as amended by the Financial Institutions Reform, Recovery and Enforcement Act ("*Section 19*").  *See* Wells Fargo Team Member Handbook, January 2012, Ex. 4, App. 55–57.

7.      In 1998, the FDIC Board of Directors adopted and published its Statement of Policy regarding application of Section 19 in the Federal Register ("*Statement of Policy*"), it clarified the Statement of Policy in its August 8, 2011 Financial Institution Letter, modified the Statement of Policy on December 18, 2012, and issued further clarification in a February 8, 2013 Financial Institution Letter.  FDIC Statement of Policy, December 1, 1998, Ex. 5, App. 58–66; Financial Institution Letter FIL-57-2011, August 8, 2011, Ex. 6, App. 68; Financial Institution Letter FIL-3-2013, February 8, 2013, Ex. 6, App. 69–71; Modifications to Statement of Policy for Section 19 of the Federal Deposit Insurance Act, December 18, 2012, Ex. 7, App. 72–76;

8.      While a person convicted of any crime covered by Section 19 and its related regulations must obtain consent from the FDIC *before* beginning work at an insured depository institution, *see* 12 U.S.C. § 1829, the agency can grant or deny an application for a Section 19 waiver in its discretion.  *See* Ex. 5, App. 65–66; FDIC Section 19 Application, Ex. 36, App. 433–37.

9.      The FDIC indicates it will not grant a Section 19 waiver unless and until the agency determines the applicant has demonstrated good cause and does not pose a risk to the safety of or public confidence in the bank for which the applicant seeks to work.  *See* Ex. 5, App. 65–66; Ex. 36, App. 433–37.

10.      According to the FDIC, Section 19 requires insured institutions "to make a reasonable inquiry regarding an applicant's history, which consists of taking steps appropriate under the circumstances, consistent with applicable law, to avoid hiring or permitting participation in its affairs by a person who has a conviction or program entry for a covered offense."  Ex. 5, App. 65.

11.      Further, "[t]he FDIC believes that at a minimum, each insured institution should establish a screening process that provides the insured institution with information concerning any convictions or program entry pertaining to a job applicant.  This would include, for example, the completion of a written employment application that requires a listing of all convictions and program entries. The FDIC will look to the circumstances of each situation to determine whether the inquiry is reasonable."  Ex. 5, App. 65.

12.      The FDIC advises its insured institutions that Section 19 "applies, by operation of law, as a statutory bar to participation absent the written consent of the FDIC."  Ex. 5, App. 65.

13.     Because Wells Fargo's employees, which it refers to as "team members," are governed by and must meet the requirements of Section 19, Wells Fargo expects they will comply and tells them of this expectation through its employee handbook sections on breach of trust or dishonesty, employment ineligibility, and background checks.  *See* Ex. 4, App. 54–57.

14.     For example, the Wells Fargo January 2012 Team Member Handbook stated,

Background Checks

Background checks are important to protect Wells Fargo's team members and its assets and to comply with federal regulations that prohibit us from employing or associating with someone convicted of certain crimes involving dishonesty or breach of trust (see Breach of Trust or Dishonesty).  Because of this, it is Wells Fargo's policy that new hires and rehires may not begin work as a team member until the background screening process has been successfully completed.

We conduct a criminal background investigation on each person who is offered a job at Wells Fargo, including those who may be rehires.  We may also investigate the employment and education background of any team member.  We reserve the right to deny or terminate employment based on the results of the check.  To ensure compliance with regulatory requirements and to ensure appropriate oversight of certain fiduciary responsibilities, Wells Fargo requires team members who are in certain positions to be rescreened periodically.  Managers of team members in these positions will be notified of the need to rescreen.  Incumbents in these positions will be notified of this requirement and are expected to fully comply and cooperate with the process of rescreening.  Failure to do so could result in corrective action, which may include termination of employment.

Ex. 4, App. 55.

15.     The Wells Fargo January 2012 Team Member Handbook further stated:

Breach of Trust or Dishonesty

Because Wells Fargo is federally insured — and because we have an obligation to the customers who trust us with their financial and personal information — we won't hire or continue to employ anyone who fails to meet certain specific criteria regarding trust and honesty.

FIRREA

The Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA) amended section 19 of the Federal Deposit Insurance Act to prohibit a national bank and its affiliates from employing anyone who has been convicted of certain

criminal acts of dishonesty, breach of trust, money laundering, or drug trafficking or manufacturing.  This law also applies when an individual has participated in a court-authorized diversion program in connection with such an act even if the charges are ultimately suspended or dismissed.

Ex. 4, App. 56.

16.     The Wells Fargo January 2012 Team Member Handbook lastly stated:

Not employable

Any individual who doesn't meet the FIRREA criteria, isn't bondable, or otherwise doesn't meet our background screening requirements cannot be employed or continue to be employed at Wells Fargo.  See Involuntary Termination.

Ex. 4, App. 56.

17.     Wells Fargo also tells applicants and persons receiving job offers that they must comply with various laws such as Section 19 and will be subject to background checks intended to aid in compliance with those laws.  *See, e.g.*, Plaintiffs' Employment Application Exemplars, Ex. 9, App. 86; *see also, e.g.*, Plaintiffs' Offer Letter Exemplars, Ex. 10, App. 124.

**C.      *The 2008 Economic Collapse and Changes in the Federal Banking Regulatory Climate that Followed***

18.     In 2008, the United States experienced a significant economic downturn as part of a global financial crisis and recession.  Some of America's larger financial institutions were imperiled, including mortgage companies such as Countrywide Financial, savings banks such as Washington Mutual, banks such as Wachovia, and Wall Street companies such as Lehman Brothers and Bear Stearns.  *See* M. Baily, W. Bekker, and S. Holmes, *The Four Big Banks:  The Evolution of the Financial Section, Part I*, The Brookings Institution (May 2015), Ex. 11, App. 138–50.

19.     The federal government also looked to stronger financial institutions such as Wells Fargo to assume the businesses, operations, and employees of failing institutions and, in this climate, Wells Fargo agreed to acquire Wachovia.  *See, e.g.*, Ex. 11, App. 139.

20.     As part of the recovery efforts made in the wake of the financial crisis of 2008, the federal government increased its regulation of U.S. financial services companies by implementing regulatory oversight initiatives that changed how most those financial services companies conducted business.  For example, in 2010, Congress passed and President Barack Obama signed the Dodd-Frank Wall Street Reform and Consumer Protection Act, a statute that "spans over 2,300 pages and affects almost every aspect of the U.S. financial services industry." W. Sweet, Harvard Law School Program on Corporate Governance, *Dodd-Frank Act Becomes Law*, July 21, 2010, Ex. 12, App. 151.

21.     "The objectives ascribed to the [Dodd–Frank] Act by its proponents in Congress and by the President include restoring public confidence in the financial system, preventing another financial crisis, and allowing any future asset bubble to be detected and deflated before another financial crisis ensues."  Ex. 12, App. 151.

22.     The Secure and Fair Enforcement for Mortgage Licensing Act of 2008, 12 U.S.C. § 5101, *et. seq*, (the "*SAFE Act*") and its rules that became effective on October 1, 2010, changed how mortgage origination could be conducted by businesses such as Wells Fargo and imposed requirements that loan origination personnel must obtain a federal registration to conduct business.  *See* OCC's Office of Thrift Supervision Memorandum, dated July 28, 2010, Ex. 13, App. 154.

23.     The SAFE Act, 12 U.S.C. § 5104(b)(2), and Regulation G adopted pursuant to it further imposed employment eligibility requirements parallel and in addition to those of Section

19 that require all mortgage loan originators disclose as part of the registration process "[c]riminal convictions involving dishonesty, breach of trust, or money laundering against the MLO," in order to "enhance consumer protection."  *See* CFPB Memorandum *Disciplinary Action Functionality added to the Nationwide Mortgage Licensing System and Registry*, dated October 12, 2012, Ex. 14, App. 156.

24.     The FDIC has taken the position that the SAFE Act further requires persons seeking to work as mortgage loan originators at the FDIC-insured institutions that employed them to provide information to the national registry clearinghouse (the Nationwide Mortgage Licensing System and Registry), including fingerprints, so that a fingerprint-based criminal background check could be completed as part of the registration process.  *See* FDIC Financial Institution Letter, *Notice of Joint Final Rule: Registration of Residential Mortgage Loan Originators*, FIL-43-2010, dated July 30, 2010, Ex. 6, App. 67.

25.     On September 23, 2011, the United States Department of Housing and Urban Development issued guidance, effective immediately, that lenders or mortgagees such as Wells Fargo continuously needed to meet to proceed as FHA approved lenders.  Those requirements imposed disclosure obligations if a manager, supervisor, loan processor, loan underwriter, loan originator, or officer "has been indicted for, or convicted of, an offense that reflects adversely upon the integrity, competency, or fitness to meet the responsibilities of the lender or mortgagee to participate in the Title I or Title II programs" or had a felony related to participation in the real estate or mortgage loan industry "at any time preceding such date of application, if such felony involved an act of fraud, dishonesty, or breach of trust, or money laundering. . . ."  FHA Revised Lender Approval Requirements, Mortgagee Letter 2011-34 (September 23, 2011), Ex. 8, App. 79–80.

**D.** ***Wells Fargo Completes the Wachovia Acquisition and Works to Conform Its Background Check Procedures***

26.     Wells Fargo completed its acquisition of Wachovia on December 31, 2008.  Wells Fargo & Company Annual Report 2008, Ex. 25, App. 310.

27.     At that time, Wachovia used fingerprint-based criminal background screenings. Declaration of Deb Mitchell, dated January 29, 2016, bearing the *Eggers* case caption at Ex. 32 at ¶ 7, App. 353.

28.     Prior to mid-March 2010, Wells Fargo's Section 19 background screening process did not involve conducting FBI fingerprint-based background screenings.  Ex. 32 at ¶ 4, App. 352.

29.     Prior to mid-March 2010, the Wells Fargo screening process involved a name-based search of criminal background check records through a third-party vendor.  Ex. 32 at ¶ 5, App. 352.

30.     The name-based criminal records searches conducted prior to mid-March 2010 returned less robust results than searches from the database maintained by the FBI because many older or non-public conviction records would not be revealed using only a name-based background screening process.  Ex. 32 at ¶ 6, App. 352–53.

31.     In approximately 2010, Wells Fargo engaged First Advantage as its background check vendor.  Ex. 32 at ¶ 8, App. 353.

32.     By early 2010, Wells Fargo required all persons receiving contingent offers of employment to complete and pass FBI fingerprint-based criminal background screenings prior to beginning employment.  Executive Summary for HR Teams, WFHM Background Check Project, Notes from November 28, 2011 Update Meeting, Ex. 27, App. 320.

33.     In this same time frame, some WFHM sales team members (for example, mortgage loan originators) were required to be fingerprinted and rescreened as a part of new SAFE Act requirements.  Ex. 27, App. 320.

34.     WFHM reviewed its criminal background screening procedures in 2009 and 2010 regarding current team members in light of new regulatory requirements, such as the SAFE Act and new FHA guidance, and the use and availability of FBI fingerprint-based background screenings.  Ex. 32 at ¶ 5, App. 352; *see also* Ex. 8, App. 77–81.

35.     WFHM determined that because a significant portion of its team members would be impacted by SAFE registration and additional screenings for purposes of compliance with other programs such as those administered by the Veterans Administration or the Federal Housing Administration, it was a prudent business practice to rescreen all team members within the WFHM line of business involving loan origination, processing, or servicing whether or not the individual team member would be a registered mortgage loan originator subject to the SAFE Act.  *See* Ex. 27, App. 320; *see also* Communications Plan, November 4, 2011, Ex. 28, App. 323; WFHM HR Background Checks Project, WFHM Manager Meetings Presentation, November 2011, Ex. 29, App. 329–30; Ex. 32 at ¶ 8, App. 353.

36.     Therefore, in late 2011 and 2012, a two-phase rescreen project was implemented in which WFHM team members would undergo a rescreening of their criminal history, including an FBI fingerprint-based search.  *See* Ex. 27, App. 320.

37.     WFHM announced the rescreen and communicated the decision to team members explaining why the rescreen project was being undertaken and the need for fingerprinting and updated background checks.  Ex. 3, at ¶ 7, App. 52; Reminder-Action Required:  Fingerprinting and Background Checks Begin Email, December 28, 2011, Ex. 30, App. 337–38.

38.     In addition, WFHM made the business judgment that "[t]his consistent approach to background checks also will allow us to better manage resources, enabling team members to more easily move into different areas of the business regardless of product type and the various regulatory requirements that govern those products."  Ex. 29, App. 330; Ex. 3 at ¶ 8, App. 52.

39.     Wells Fargo was not alone in increasing its compliance efforts around this time. In a November 2012 report from the Executive Director of the FDIC that its acting general counsel signed in concurrence, the agency explained why it was experiencing a surge in Section 19 waiver applications:

> The increase in applications largely resulted from two factors.  First, recent mergers of entities, such as investment firms, into banks have made Section 19 applicable to employees not previously covered.  Second the Secure and Fair Enforcement for Mortgage Act of 2008 requires insured institutions to perform checks on all mortgage loan originators.  Some insured institutions, after performing the new required background checks, recognized deficiencies in their background check process, and performed new background checks on *all* employees.

FDIC Report, *Modifications to the Statement of Policy for Section 19 of the Federal Deposit Insurance (FDI) Act*, November 26, 2012 (emphasis in original), Ex. 31, App. 340.

### E.     *WFHM Conducts Team Member Background Check Rescreening*

40.     The first phase of the WFHM rescreen project began in December 2011, and a second phase began in approximately March 2012.  Ex. 29, App. 330.

41.     In general, the WFHM rescreen process began with email communications to both the manager and the team member in advance of emails being sent to the team member by Wells Fargo's third-party background check vendor, First Advantage.  Ex. 28, App. 324.

42.     The team member then completed information and consent forms and chose a location to be fingerprinted.  *See* Ex. 29, App. 324; *see* Background Check Application Forms, Ex. 23, App. 249–79.

43.     After securing fingerprints from the team member, First Advantage obtained

criminal conviction records, generated a criminal background report, and obtained the FBI's

criminal history information.  *See* First Advantage Pre-Employment Security Screenings, Ex. 22,

App. 209–49; *see also* Ex. 24, App. 280–307.

44.     When information on a particular person was obtained from First Advantage,

Wells Fargo undertook an individualized review for any person who was flagged as possibly

ineligible for employment under Section 19.   *See* Ex. 32 at ¶ 9, App. 353.

45.     The individualized review for each team member who was flagged as possibly

disqualified in the WFHM rescreen involved applying objective Section 19 eligibility criteria and

produced case-by-case decisions that determined whether the person's criminal history record

information triggered the statutory disqualification of 12 U.S.C. § 1829.  Ex. 32 at ¶ 10, App.

353.

46.     First, a member of Wells Fargo's Background Screening Compliance Team

("*BSCT*") reviewed the results for each team member who was flagged as possibly disqualified

in the WFHM rescreen, processed the case, and made a preliminary determination of eligibility.

*See* Ex. 32 at ¶ 11, App. 353.

47.     During these initial reviews for regulatory eligibility under Section 19, if a

disqualifying conviction was identified, the BSCT would review the FDIC *de minimis* criteria to

see if the flagged team member could otherwise satisfy all of the factors needed for an automatic

FDIC exemption.  Ex. 32 at ¶ 12, App. 353.

48.     Another member of the BSCT reviewed the preliminary determination of

eligibility and either agreed or disagreed with the original processor on whether, for example, the

flagged team member was not eligible due to Section 19 regulatory considerations. *See* Ex. 32 at ¶ 13, App. 353.

49.     If as a result of this individualized review, a given WFHM team member was coded as ineligible by the final reviewer in the case management system, the record was assigned to a Corporate Employee Relations Consultant for additional case review. Ex. 32 at ¶ 14, App. 354.

50.     After the Corporate Employee Relations Consultant conducted additional review, the record would be finalized and the correct eligibility decision was applied. Ex. 32 at ¶ 15, App. 354.

51.     Once the review was completed and a team member who was part of the WFHM rescreen was deemed ineligible for continued employment due to a Section 19 regulatory disqualifying record, Corporate Employee Relations sent an email notifying a team of Employee Relations Consultants that supported the WFHM line of business regarding the team member's ineligibility. Ex. 32 at ¶ 16, App. 354.

52.     The WFHM line of business Employee Relations Consultants then set in motion the employment termination process by communicating with the ineligible team member's direct manager. Ex. 32 at ¶ 17, App. 354.

53.     The WFHM line of business Employee Relations Consultant prepared the manager for a termination meeting that he or she would be asked to conduct in person with the team member who was deemed ineligible for employment under Section 19. Ex. 32 at ¶ 18, App. 354.

54. However, the WFHM line of business Employee Relations Consultant did not disclose specifics of the negative background check results with the manager, in part, because of the sensitive nature of the information. Ex. 32 at ¶ 19, App. 354.

55. The team member's manager took responsibility for facilitating the termination discussion although a WFHM line of business Employee Relations Consultant may also have been involved in the discussion. Ex. 32 at ¶ 20, App. 354.

56. If during the course of the termination discussion, a team member indicated that he or she had information to dispute the criminal conviction record, the termination would be put on hold and an Employee Relations Consultant would follow up with the team member. Ex. 32 at ¶ 21, App. 354.

57. Team members were also instructed to contact a designated line of business Employee Relations Consultant contact with specific rescreen questions. Ex. 32 at ¶ 22, App. 355.

58. If after the individualized review and verification process, Wells Fargo confirmed a team member's rescreen criminal conviction information demonstrated he or she was ineligible for continued employment pursuant to Section 19, discharge occurred. Ex. 32 at ¶ 24, App. 355.

**F.** ***As Mandated by Section 19 Wells Fargo Terminates the Employment of Ineligible Team Members Upon Learning of Disqualifying Convictions through the Rescreening***

59. In June 2012, WFHM sent team members an update informing them that the background check rescreening was nearly complete. Background Check Rescreening Update, Ex. 34, App. 359–60.

60. The rescreen process in the WFHM line of business during 2011 and 2012 involved approximately 31,769 fingerprint-based background checks. Ex. 32 at ¶ 25, App. 355.

61. First Advantage advised Wells Fargo of approximately 4,723 individual team members whose WFHM background rescreen results indicated a criminal conviction potentially making that person ineligible for Wells Fargo employment.  Ex. 32 at ¶ 26, App. 355.

62. Wells Fargo's BSCT independently reviewed the results of each of the approximately 4,723 individual team members' criminal background results, embarking upon an individualized assessment of each team member's criminal history compared to federally-mandated Section 19 eligibility standards, including application of the FDIC's then-existing *de minimis* criteria.   Ex. 32 at ¶ 27, App. 355.

63. Approximately 361 of those team members were deemed ineligible under Section 19 in the WFHM rescreen and then were discharged from employment.  Ex. 32 at ¶ 28, App. 355.

64. In the WFHM rescreen, the team member identified by process number 13651941 was found to be ineligible and discharged under Section 19 once convictions for federal felony bank fraud (with 21 months in jail served) and four different crimes of theft became known.  Excerpt Background Check Justification Notes, Ex. 33, App. 357.

65. In the WFHM rescreen, the team member identified by process number 13784671 was found to be ineligible and discharged under Section 19 as a result of two convictions—11 years apart—for felony embezzlement by a fiduciary and aiding and abetting embezzlement.  Ex. 33, App. 358.

### G.   *The FDIC Section 19 Waiver Process, the Burdens It Imposes, and Wells Fargo's Business Judgment Against Doing So*

66. The FDIC permits only "two methods by which a [disqualified individual] can apply to the FDIC for written permission" to work for an insured depository institution.  Ex. 36, App. 436.

67.     One involves "an insured depository institution filing a Section 19 application on behalf of a *prospective* director, officer, or employee (Sponsorship)."  Ex. 36,  App. 436 (emphasis added).

68.     The second method involves an individual "seek[ing] a waiver of the requirement that an insured depository institution file a Section 19 application on their behalf (Individual Waiver)" and completing the waiver application on his or her own.  Ex. 36,  App. 436.

69.     The FDIC estimates the time to complete a Section 19 application is "16 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information."  Ex. 36,  App. 435.

70.     The requirements of the FDIC Section 19 waiver application form necessitate investigation of and access to personal information about an individual, including the circumstances of the disqualifying crime and his or her rehabilitation, his or her subsequent conduct and reputation, and financial statements and reports concerning the individual and his or her spouse (if applicable).  *See, e.g.*, Ex. 36,  App. 439–47; *see also, e.g.*, Ex. 51, App. 721–45.

71.     For example, Section E of the FDIC Section 19 waiver application form requires, among other things, a description of the "nature of the crime," its "disposition," and the "nature of the offense and the circumstances surrounding it" including the "age of the employee at the time of conviction, date of the offense, and any mitigating circumstances . . . ."  *See, e.g.*, Ex. 36, App. 440

72.     The FDIC Section 19 waiver application form also seeks "the extent of rehabilitation of the covered person" which may include "subsequent convictions or lack thereof; employment history after conviction . . . highlighting any demonstrated fiduciary responsibility;

[l]etters of reference . . . [and] [c]ommunity service or volunteer work." *See, e.g.*, Ex. 36, App. 440.

73.     The FDIC Section 19 waiver application form also seeks contact information for individuals who may "verify evidence of rehabilitation for each item you wish to have considered as evidence of your rehabilitation." *See, e.g.*, Ex. 36, App. 440.

74.     The FDIC Section 19 waiver application form also requires "copies of the Indictment, Information, or Complaint and Final Decree of Judgment" and requests "any other pertinent facts relative to the crime which are not disclosed" in those documents. *See, e.g.*, Ex. 36, App. 441.

75.     The FDIC Section 19 waiver application form requires significant financial disclosures about the person the FDIC is considering for a Section 19 waiver, many of which cannot be obtained without the participation of the ineligible applicant, and even in some instances, his or her spouse. *See, e.g.*, Ex. 36, App. 469–99.

76.     The FDIC has indicated it seeks this information to assess "the risk to the insured depository institution in the employment of the prospective employee." Ex. 36, App. 437.

77.     The FDIC has stated that the first two of the its nine "essential criteria" in making this determination are:

(1)     The conviction or program entry and the specific nature and circumstances of the covered offense; and

(2)     Evidence of rehabilitation including the person's reputation since the conviction or program entry; the person's age at the time of conviction or program entry, and the time which has elapsed since the conviction or program entry.

Ex. 36, App. 437.

78.     This information—"essential" to the FDIC's assessment—such as knowledge of

the "specific nature and circumstances" of an individual's disqualifying offense or a ready

assessments regarding an individual's "rehabilitation" or "reputation since the conviction" is not

likely in the possession of Wells Fargo.  Ex. 36,  App. 437.  Those are facts uniquely held by an

ineligible applicant or employee, not an employer or prospective employer.

79.     In the instance of sponsorship, Section C of the FDIC Section 19 waiver

application form requires specific notice to, and written assurances from, the insured depository

institution's fidelity insurer.  Specifically:

> *The insured depository institution's fidelity insurer is to be notified of all*
> *pertinent information regarding the conviction of the prospective employee.*
> *Assurances from the fidelity insurer must be obtained, in writing, stating the*
> *prospective . . . employee will be covered by the insured depository institution's*
> *fidelity bond.*  This application and the information requested herein may be
> submitted prior to notification of the bonding company; however, the FDIC's
> consent will be subject to a condition that written assurance of fidelity coverage to
> the same extent as others in similar positions be obtained by the insured
> depository institution.

Ex. 36,  App. 438 (emphasis in original in bolded text).

80.     Thus, not only must a sponsoring institution await the approval of the FDIC, it

must await approval of its fidelity insurer.  Ex. 36,  App. 438.

81.     In addition, FDIC Section 19 waiver application form specifies that sponsorship

requires an insured depository institution to certify that its board of directors either delegated to

the institution official signing the application the authority to make Section 19 applications or

that the institution's board adopted a resolution authorizing the application.  Ex. 36,  App. 443.

82.     In its Section 19 waiver application form, the FDIC makes clear that the

biographical and criminal history information provided in a Section 19 application may lead to

future arrest or prosecution:  "Should the information [in an application] indicate a violation of

law, the application may be referred to any agency responsible for investigating or prosecuting such a violation." Ex. 36,  App. 441.

83.     The FDIC states it "cannot finalize its consideration of a Section 19 waiver application until all necessary information and background checks have been received and reviewed.  Background checks from certain law enforcement agencies can take several months and, until recently, the waiting time for these background checks was responsible for most of the processing time for a typical Section 19 application." M. Gruenberg Letter to Hon. C. Grassley, October 5, 2012 (October 5, 2012). Ex. 16, App. 164.

84.     While an insured depository institution could seek or sponsor a waiver on behalf of a disqualified individual, Section 19 does not require it to do so and otherwise permits individuals to file their own applications. *See, e.g.*, Ex. 7, App. 72–75; Ex. 36, App. 436.

85.     Wells Fargo does not seek or sponsor any individual person's Section 19 waiver application. *See* Ex. 32 at ¶ 29, App. 355; Talking Points for use with Managers and Team Members regarding Background Check Process, Ex. 15, App. 160; Deposition of Peter DeLanoit at 97:18–98:23, Ex. 47, App. 708; Deposition of Deb Mitchell at 176:9-10, Ex. 48, App. 717.

86.     Wells Fargo is not alone in declining to sponsor Section 19 waiver applications to the FDIC.  In a letter from FDIC acting chairman Martin J. Gruenberg to U.S. Senator Charles Grassley of Iowa responding to his inquiry about Section 19 waivers, the agency's head wrote that in adopting the Statement of Policy, "the FDIC acknowledged that many institutions were not willing to file applications on behalf of a convicted individual under any circumstance." Ex. 16,  App. 163.

87.     Wells Fargo's position was "[t]he application for a waiver would need to be pursued by the team member on his\her own as Wells Fargo does not apply for waivers on a person's behalf." Ex. 15, App. 160.

88.     Wells Fargo's guidance to Employee Relations Consultants was that team members with questions regarding the Section 19 waiver process can contact the FDIC. Ex. 15, App. 160.

89.     Wells Fargo's decision not to sponsor Section 19 waiver applications was a product of its business judgment. DeLanoit Dep. 97:18–98:23, Ex. 47, App. 708.

90.     According to Peter DeLanoit, WFHM's senior vice president for human resources, the business decision not to sponsor Section 19 waiver applications stemmed from issues such as "we wouldn't know the timing, we wouldn't know the criteria, we wouldn't know the length of time, or we wouldn't even know whether they [the ineligible team members] were interested in doing that." DeLanoit Dep. at 142:14–143:16, Ex. 47, App. 711.

91.     Wells Fargo's decision not to sponsor Section 19 waiver applications also was grounded in fostering consistency. As Wells Fargo corporate employee relations consultant Deb Mitchell testified,

> Again, we had taken a look at that and decided that it was not a workable proposition for us for a number of reasons. One of the more compelling reasons is that if you do it for one, you have to do it for everybody, and we could certainly anticipate that there would be a time, there would be an individual with a type of a record where it did not make sense to sponsor that individual's application and yet we would feel obligated to do so, so in order to be really equitable, we decided not to do it for anybody.

Deposition of Deb Mitchell at 176:13–23, Ex. 48, App. 717.

92.     Mitchell further testified, "[W]e didn't want to be tied into facing that situation of having to sponsor somebody who it would be inappropriate to sponsor, that the equitable decision was not to sponsor anybody."  Mitchell Dep. at 177:3–6, Ex. 48, App. 718.

**H.**     ***Plaintiffs' WFHM Employment History and Criminal Conviction Screens***

93.     Cara Williams began working for WFHM in 2008.  Her 2012 fingerprint based background rescreen confirmed two disqualifying theft convictions so she was discharged for Section 19 ineligibility in January 2012.  FAC ¶¶ 22, 24, 34; Ex. 1, App. 3–4; Admissions Request Responses by Plaintiffs, Ex. 17, App. 165; Termination Letter, Ex. 35, App. 361.

94.     Wells Fargo hired Johnita Slaughter in 2007.  Her 2012 fingerprint based background rescreen confirmed a disqualifying conviction related to fraudulent receipt of welfare benefits so Slaughter was discharged for Section 19 ineligibility in February 2012.  FAC ¶¶ 50, 52, 62; Ex. 1, App. 6–7; Ex. 17, App. 168; Ex. 35, App. 362.

95.     Wells Fargo hired Mandre Miller in 2004.  Her 2012 fingerprint based background rescreen confirmed a disqualifying felony conviction for forgery so Miller was discharged for Section 19 ineligibility in February 2012.  FAC ¶¶ 78, 80, 89; Ex. 1, App. 9–10; First Advantage Pre-Employment/Security Screening, Ex. 22, App. 217; Ex. 35, App. 363.

96.     Wells Fargo hired James Collier in 2004.  His 2012 fingerprint based background rescreen confirmed a disqualifying conviction for felony possession of marijuana with intent to deliver and failure to affix a tax stamp so Collier was discharged for Section 19 ineligibility in May 2012.  FAC ¶¶ 105, 107, 115; Ex. 1, App. 12–13; Ex. 35, App. 364; *see also* Ex. 5, App. 66

97.     Wells Fargo hired Teresa Jones in 2001.  Her 2012 fingerprint based background rescreen confirmed a disqualifying conviction for fraudulent practices related to receipt of public

benefits so she was discharged for Section 19 ineligibility in February 2012.  FAC ¶¶ 126, 128, 136; Ex. 1, App. 14–15; Ex. 17, App. 174; Ex. 35, App. 365.

98.    Wells Fargo hired Chance Kenyon in 2006.  Her 2012 fingerprint based background rescreen confirmed two disqualifying theft convictions so she was discharged for Section 19 ineligibility in May 2012.  FAC ¶¶ 147, 149, 157; Ex. 1, App. 16–17; Ex. 17, App. 177, Ex. 35, App. 366.

99.    Wells Fargo hired Anthony Williams in 2006.  His 2012 fingerprint based background rescreen revealed an attempted burglary conviction, which Wells Fargo believed constituted a Section 19 disqualifying conviction, so he was discharged for Section 19 ineligibility in May 2012.  FAC ¶¶ 168, 170, 178; Ex. 1, App. 18–19; Ex. 17, App. 180, Ex. 35, App. 367.

100.    LeRoy Fields-Campbell was hired by a predecessor in interest to Wells Fargo in 2000, and began working at WFHM in 2009.  His 2012 fingerprint based background rescreen confirmed a disqualifying theft conviction so he was discharged for Section 19 ineligibility in May 2012.  FAC ¶¶ 217, 220, 229; Ex. 1, App. 22–23; Fields-Campbell Employment Application, Ex. 9, App. 119–122; Ex. 35, App. 368.

101.    Dwann Jones applied for several positions with Wells Fargo in 2014, including positions for which he received offers of employment in August 2014 and November 2014 contingent upon successful completion of post-offer background checks.  He was not hired because his 2014 post-offer fingerprint based background screenings confirmed he was convicted for manufacturing or delivery of a controlled substance that made him ineligible for employment under Section 19.  FAC ¶¶ 189, 191, 208; Ex. 1, App. 20–21; Ex. 9, App. 109–118;

Contingent Offer Communications, Ex. 10, App. 131–35; FBI Fingerprint Background Check

Results, Ex. 24, App. 303–07; *see also* Ex. 5, App. 66.

102.    Some Plaintiffs, for example, Cara Williams, did not disclose their convictions to

Wells Fargo at the time they applied for employment.  *See* Ex. 9, App. 85.

103.    No Plaintiff had sought and no Plaintiff held consent from the FDIC to work for a

federally insured depository institution prior to his or her discharge as part of the WFHM

rescreen.  *See, e.g.*, Ex. 17,  App. 166, 172, 175, 178.

104.    As a standard practice in its offers of employment, Wells Fargo disclosed to new

hires:

    a.    "As a federally insured institution, Wells Fargo is unable to employ
          individuals who have been convicted of or participated in a pre-trial
          diversion program with respect to, a crime of dishonesty or breach of trust
          and/or any person who does not meet our bond requirements."

    b.    His or her employment was at-will and either the employee or Wells Fargo
          had the right to terminate her or his employment "at any time, with or
          without advance notice and with or without cause."

*See, e.g.*, Ex. 10, App. 124, 126, 128, 130, 136–37.

105.    In the standard Team Member Handbook Acknowledgements executed by

employees such as the Plaintiffs (except for Dwann Jones), team members affirmed that they had

been advised about the Handbook for Wells Fargo Team Members, its availability in hard copy

and/or online forms, and its applicability then and in the future.  Team Member Handbook

Acknowledgement Exemplars, Ex. 20,  App. 198–204.

106.    For example, the 2005 Wells Fargo Team Member Handbook stated the following

with respect to Section 19:  "Background checks are important to protect Wells Fargo's team

members and its assets, as well as to comply with federal regulations that prohibit us from

employing or associating with someone convicted of certain crimes involving dishonesty or breach of trust." 2005 Wells Fargo Team Member Handbook, Ex. 21, App. 207.

107.   That 2005 handbook also advised, "Any individual who doesn't meet the FIRREA criteria, isn't bondable, or otherwise doesn't meet our criminal background screening requirements cannot be employed or continue employment at Wells Fargo." Ex. 21, App. 208.

**I.**   ***Teresa Jones and James Collier Obtain FDIC Waivers and Wells Fargo Rehires Each.***

108.   After they were discharged for Section 19 ineligibility, Teresa Jones and Collier filed applications with the FDIC for Section 19 waivers on February 25, 2012, and October 17, 2012, respectively, allowing each to work for an insured depository institution. Section 19 Waiver Applications, Ex. 36, App. 394–499.

109.   Their application forms required them to acknowledge a conviction for a disqualifying offense under Section 19. *See generally* Ex. 36, App. 394–499.

110.   The FDIC exercised its discretion by granting Teresa Jones and Collier Section 19 waivers on August 16, 2012, and February 8, 2013, respectively. Section 19 Waivers, Ex. 18, App. 187–95.

111.   Once the FDIC provided its consent, Teresa Jones and Collier became eligible to work for federally insured depository institutions such as Wells Fargo. Ex. 18, App. 187–95.

112.   After Teresa Jones became eligible to work at FDIC insured depository institutions and provided Wells Fargo with her FDIC waiver, Wells Fargo offered her re-employment in her prior position with the same salary. Teresa Jones, Re-Employment Offer Letter, Ex. 38, App. 503–05.

113.   She accepted. Ex. 38, App. 503–05.

114.    In the 80 days after she was discharged for Section 19 ineligibility, Teresa Jones: (a) investigated the FDIC waiver process and received written guidance on it from the FDIC on March 26, 2012; (b) assembled 38 pages of materials to submit to the FDIC as part of her Section 19 waiver application, including recommendation letters and personal financial information; (c) composed a consent request letter on April 25, 2012, stating "I am seeking a Blanket waiver pursuant to this law. I am requesting this application and waiver as an Individual with no Bank sponsorship"; and, (d) filed her completed application form with the Kansas City office of the FDIC on May 4, 2012, in which she stated, "I am just asking for another chance to be trusted." Ex. 36, App. 394–431.

115.    After she was discharged for Section 19 ineligibility, Kenyon sought a Section 19 waiver from the FDIC on July 18, 2012, received it on January 25, 2013, but did not seek re-employment with Wells Fargo.  Kenyon FDIC Section 19 waiver, Ex. 36, App. 369–93; Ex. 18, App. 183–86.

116.    Slaughter also contacted the FDIC regarding the Section 19 waiver process after her discharge and received a packet of information from the FDIC on January 31, 2013, including a Section 19 waiver application form, but Slaughter did not submit a Section 19 waiver application to the FDIC and accordingly does not have an FDIC Section 19 waiver.  FDIC Section 19 correspondence to Slaughter, Ex. 37,  App. 500–02.

117.    Additionally, after he was discharged for Section 19 ineligibility, Anthony Williams approached the FDIC about Section 19.  FDIC correspondence to A. Williams, Ex. 19, App. 196–97.

118.    An FDIC staff member then reviewed the particulars of Anthony Williams' attempted burglary conviction and on September 9, 2012, opined that because it was for an

unlawful entry relating to a domestic incident it was not crime of dishonesty for which an FDIC

Section 19 waiver would be necessary.  Ex. 19,  App. 196–97.

119.    Anthony Williams forwarded that information to Wells Fargo, which reinstated

him to his former job with back pay on October 8, 2012.  He remains a Wells Fargo employee

today.  Wells Fargo letter to A. Williams regarding reinstatement.  Ex. 39,  App. 506.

120.    Requests by ineligible former WFHM team members such as Plaintiffs Teresa

Jones, Collier, and Kenyon for FDIC waivers were part of a "surge" in Section 19 waiver

applications experienced in 2012 by the FDIC, as noted in a November 2012 agency

memorandum recommending changes to the *de minimis* criteria.  *See* Ex. 31, App. 340; *see also*

Ex. 36, App. 369–499.

### J.    *Plaintiffs File Charges of Discrimination with State and Federal Agencies That the Agencies Decline to Prosecute*

121.    Plaintiffs, except Fields-Campbell, filed charges of discrimination with the Iowa

Civil Rights Commission ("*ICRC*") in August 2012 (Teresa Jones, Kenyon, and Anthony

Williams), September 2012 (Miller, Cara Williams, and Collier), November 2012 (Slaughter),

and February 2015 (Dwann Jones), and requested they be cross-filed with the Equal Opportunity

Employment Commission ("*EEOC*").  Administrative complaints, Ex. 40,  App. 507–56.

122.    In August 2012, Fields-Campbell filed a charge of discrimination in Texas that

was cross-filed with the EEOC.  Ex. 40,  App. 557–59.

123.    On his charge form, Fields-Campbell checked the box for "Race" discrimination

and complained about an incident in which he allegedly suffered an injury from bed bugs on a

business trip and his discharge from employment stating, "I believe that I have been

discriminated against because of my race, African American, in violation of Title VII of the Civil

Rights Act of 1964." Ex. 40,  App. 557–59.

124.     In the subject matter questions for their Iowa complaints, Plaintiffs variously alleged they were discriminated against because of age, race, sex, sexual orientation, and disability.  *See, e.g.*, Ex. 40,  App. 507–56.

125.     Representative of this, Teresa Jones' charge of discrimination detailed the grounds for her complaint, stating in part:

> Wells Fargo fired me on July 12, 2012 because of a discriminatory background check policy.
>
> * * *
>
> Wells Fargo's criminal background check policy is discriminatory because African-Americans, Hispanics, older workers and other protected classes of individuals are more likely to be convicted of certain types of crimes.  The length of time between my past mistake and Wells Fargo's decision to fire me proves that my prior conviction is not job-related.  Thus, *Wells Fargo's criminal background check policy* has a disparate impact on protected classes.
>
> * * *
>
> I bring this claim against Wells Fargo and First Advantage Background Services because they implemented and conducted a discriminatory background check policy that resulted in the loss of my career. . . .  Additionally, I bring this claim against the FDIC – the entity charged with administering the law under which these background checks have been conducted.  The law itself unconstitutionally discriminates against protected classes of individuals.
>
> This complaint is intended to place Wells Fargo, First Advantage, and the FDIC on notice of class-wide intentional and unintentional forms of systemic discrimination affecting protected classes of applicants and employees who are adversely affected by the above-mentioned background check policy. . . .

Ex. 40,  App. 535–36 (emphasis added).

126.     The ICRC case determinations regarding the Iowa Plaintiffs who were discharged based on Section 19 concluded the complaints did not merit further processing and administratively closed them.  *See* ICRC Administrative Closure Letters, Screening Data Analysis and Case Determinations, and Case Closure Forms, Ex. 41, App. 560–650.

127.    The ICRC case determinations regarding the Iowa Plaintiffs who were discharged based on Section 19 held, "Respondent has no discretion under Section 19 and is afforded a defense to any Title VII, ADAAA, or ADEA claim.  Based on the information collected to date, Complainant's disparate impact claim does not merit further investigation."  *See, e.g.*, Ex. 41, App. 618.

128.    Following the ICRC's closures of their charges of discrimination, the Iowa Plaintiffs who were discharged based on Section 19 requested that the agency reopen and reconsider their administrative complaints.  Plaintiffs' ICRC Request for Reconsideration, March 21, 2013, Ex. 42,  App. 664–69.

129.    After completing a "thorough review" of the arguments and additional information submitted by the Iowa Plaintiffs who were discharged based on Section 19, and "considering the arguments from both sides," the ICRC Executive Director entered a formal Order and Notice Denying Reopening on June 7, 2013.  *See, e.g.*, ICRC Order and Notice Denying Reopening, Ex. 43,  App. 676.

130.    The ICRC Executive Director's Order and Notice Denying Reopening regarding the Iowa Plaintiffs who were discharged based on Section 19 ruled that (1) "Section 19 preempts state law, including the ICRA," and (2) "the failure to provide notification of the waiver process, when not required by the Section 19 itself, does not rise to the level necessary to support a disparate impact claim."  *See, e.g.*, Ex. 43,  App. 676.

131.    The Order and Notice Denying Reopening regarding the Iowa Plaintiffs who were discharged based on Section 19 further held that "the screening analysis was correct in fact and law," and "the original decision is supported in fact and law."  *See, e.g.*, Ex. 43,  App. 676.

132.    Thereafter the EEOC and ICRC issued notices of dismissal and right to sue letters to the Plaintiffs.  Ex. 44,  App. 684–700.

133.    As with the Iowa team member Plaintiffs, the ICRC case determination regarding Dwann Jones concluded his complaint did not merit further processing and the ICRC issued an administrative closure.  Ex. 41, App. 651–63.

**K.    *Other Governmental Statements Relating to the WFHM Rescreen***

134.    In response to an inquiry from Richard Eggers, Iowa Senator Charles Grassley co-authored a letter with Iowa Congressman Tom Latham to the FDIC requesting that the agency provide information on its Section 19 guidance to banks and its processing of waiver applications.  Senator Grassley and Congressman Latham Letter to the FDIC, September 21, 2012, Ex. 45,  App. 701-02.

135.    That letter specifically noted, "Section 19 of the Federal Deposit Insurance Act (Deposit Act) of 1950 provides an important safeguard to ensure that employees within the banking system do not have a criminal history.  In 2008, this section of the Deposit Act was expanded to include employees in the mortgage industry."  Ex. 45,  App. 701.

136.    That letter noted, "While Section 19 of the Deposit Act *requires* a complete and thorough background check, the guidance issued to financial institutions and the construction of the waiver process *is at the discretion of the FDIC*."  Ex. 45,  App. 701 (emphasis added).

137.    In a May 28, 2015 EEOC Informal Discussion letter addressed to Plaintiffs' counsel, the EEOC's assistant legal counsel wrote:

> As you know, the EEOC enforces, among other laws, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.  ("Title VII"), which prohibits employment discrimination based on race, color, sex, religion, and national origin.  *Title VII does not prevent employers, including private institutions subject to Section 19, from using criminal background checks, as long as they do so*

*without discriminating on the basis of race, national origin, or another legally-protected characteristic.*

\* \* \*

*[O]ur records reflect that EEOC staff communicated directly with FDIC staff about Section 19, in particular.  In addition, the Enforcement Guidance specifically refers to Section 19 as an example of federal regulations that provide a mechanism for an employer to apply for a waiver of a federally-imposed occupational restriction. See Enforcement Guidance, at § VI.C.*

\* \* \*

*We understand that your litigation on behalf of Richard Eggers has been credited with prompting the December 2012 changes to the FDIC Policy.*[3]

\* \* \*

While we cannot comment on the specific legal theories you advance in your letter and in the pending litigation, *we can reiterate the Commission's belief that the Enforcement Guidance strikes the right balance between legitimate workplace safety issues and the imperative to eliminate discriminatory employment practices.*

*See* EEOC Informal Discussion Letter, *Title VII/Conviction Records/Federal Banking Regulations*, dated May 28, 2015, (footnotes omitted and emphasis added), Ex. 46,  App. 703–05.

### K.    *Richard Eggers-Plaintiffs' Caucasian Comparator*

138.    Plaintiffs' lawsuit alleges Wells Fargo "never notified its applicants that the bank had authority to obtain permission to waive its criminal background check policy by obtaining permission from the FDIC."  *See, e.g.*, FAC ¶¶ 30, 58, 86, Ex. 1, App. 4, 7, 10.

139.    Plaintiffs' lawsuit also alleges that Wells Fargo "never notified its employees prior to the implementation of its new criminal background check policy that they had the opportunity to obtain permission from the FDIC to work for Wells Fargo regardless of their criminal convictions from the distant past." *See, e.g.*, FAC ¶¶ 31, 59, 87, Ex. 1, App. 4, 7, 10.

140.    The Fourth Amended Complaint then alleges that Plaintiffs were treated differently based on their race because "some employees who happened to be white" among other things were told how to obtain FDIC Section 19 waivers, were terminated "months" after their criminal background checks, or received "instructions on how to obtain an exemption from the FDIC" and Plaintiffs were not told that Wells Fargo could sponsor FDIC Section 19 waiver applications. *See, e.g.*, FAC ¶¶ 36–43, 64–71, 91–98,116–20, 137–40, 158–61,179–82, 230–36, Ex. 1, App. 4–5, 7–8, 10–11, 13, 15, 17, 19, 23–24.

141.    Throughout this litigation, Plaintiffs have pointed to discharged team member Richard Eggers as the Caucasian comparator who they claim received favorable treatment because he "happened to be white." *See, e.g.*, FAC ¶¶ 39–43, Ex. 1, App. 5; Declaration of Peter S. DeLanoit to the EEOC, Ex. 52, App. 746–48.

142.    Eggers was discharged on July 12, 2012, due to Section 19 ineligibility as a result of a fraud conviction from 1963 that was confirmed through the WFHM rescreen in 2012. Eggers Termination Letter, July 12, 2012, Ex. 50, App. 720; Eggers' Section 19 Waiver Application, Ex. 51, App. 710–45.

143.    While Wells Fargo discussed with Eggers the possibility of administrative leave while he sought an FDIC waiver, he declined such leave, and his employment was terminated on July 12, 2012, due to his Section 19 ineligibility.  Case Note, recap of conversation with TM, July 12, 2012, Ex. 49, App. 719; Ex. 50, App. 720.

144.    Ultimately, Eggers was subject to the same action the other 360 team members who the WFHM rescreen results indicated could not meet Section 19 ineligibility standards—he was discharged.  Ex. 50, App. 720; Ex. 32, at ¶ 8, App. 353.

145. The facts regarding Eggers made his case unique because of circumstances other than race. DeLanoit described those circumstances as follows in response to deposition questions posed by Plaintiffs' counsel:

Q.    Do you know why Tami Burnham sent you the email in Exhibit 11?

**A.    I believe it because Mr. Eggers was deemed to be a little bit of a unique type of case, as we went through the review of his background check.**

Q.    How – what do you mean by "unique"?

**A.    Been a long time since the offense. My recollection is we had difficulty even finding the documentation, and some of the challenges that we had was we actually – I think they're mentioned in here – interviewed Richard himself to get some of the, you know, basics of that, and, you know, my understanding is that he put plug coins in a washing machine some 50 years ago, and that was certainly – you know, my understanding, is not the normal kind of case that we looked at.**

*  *  *

Q.    So Richard Eggers wasn't unique in the sense that Section 19 somehow didn't apply to him, right? Let me rephrase that. Section 19 – you knew that Section 19 applied to Richard Eggers, right?

**A.    Yes.**

Q.    So in that sense, Richard Eggers wasn't unique from anyone else who was fired because of a Section 19 conviction, right?

**A.    Yes. I would say that's fair.**

*  *  *

Q.    Also in Exhibit 11, do you see where it states that Mr. Eggers was given the option of taking up to six months of leave in order to obtain a Section 19 waiver and become eligible to return to work?

**A.    Yes.**

Q.    Was there a process put in place where all team members were offered to take leave in order to see if they could obtain a Section 19 waiver and return to work?

**A.    No.**

Q.    Why?

**A.    I'd already explained. I want to go back and I'll share it with you
again. What we learned with Mr. Eggers in this particular case with
an offense that to us was – appeared to be minor, although it didn't
meet the de minimis and it had been some 50 years prior, and, I mean,
we – that's why it took us a while even in conversations with Richard
Eggers to find out what happened. It seemed to be a very minor
offense, and that's why this particular one was treated differently.**

Q.    What other type of offenses – or are there other types of offenses that you
would consider to be minor offenses even though they don't meet FDIC de
minimis requirements?

**A.    Well, I would tell you, compared to Mr. Eggers, somebody that had an
offense 60 years ago or 70 years ago, I mean, it was pretty minor, and,
you know, again, that's – there's not a whole lot more I can share on
that. I think that was the whole purpose, that he was caught up in a –
you know, a regulatory requirement and over an offense that
appeared minor.**

Q.    Do you know whether there was a process to ask every team member who
didn't pass the background check questions about the circumstances under
which they were convicted of their crimes?

**A.    We talked a little bit just about the background check, and certainly if
it was brought forward that there were some issues, they had the
ability to inquire, I believe, from First Advantage or – so that would
be a way, or if someone says that was a mistake, there was certainly
inside of the process the ability to do that.**

DeLanoit Dep. at 176:12–177:3; 179:2–11; 182:5–183:24, Ex. 47, App. 712–14; *see also*

Ex. 52, App. 746–48.

146.    Eggers completed and submitted his own FDIC Section 19 waiver application

form, did not receive any leave of absence from Wells Fargo to apply for his waiver, and did not

experience any outcome other than the termination of his employment due to Section 19

ineligibility.  Ex. 49, App. 719; Ex. 50, App. 720; Eggers' Section 19 Waiver Application, Ex.

51, App. 721–45.

147.    No WFHM team members whose rescreen results showed Section 19 ineligibility, including Eggers, utilized leave in order to apply with the FDIC for a waiver and Wells Fargo did not sponsor any Section 19 waiver applications for them.  DeLanoit Dep. at 136:9–143:16, Ex. 47, App. 709–11; *see also* Ex. 49, App. 719.

148.    DeLanoit testified how and why WFHM did not offer leaves of absences or sponsor Section 19 waiver applications once the rescreen results confirmed to the company that the team member was ineligible by law:

Q.    Do you know whether there was a consistent practice of offering all ineligible team members the option to take leave in order to attempt to obtain a Section 19 waiver within a set time period?

**A.    I'd say it's consistent that we never had a team member that took leave in order to get a waiver, so I would say from that perspective it was absolutely a consistent process.**

Q.    Why wasn't there a process for team members to take leave in an attempt to obtain a Section 19 waiver?

**A.    We covered some of this earlier, but when we originally defined the process, scoped out the work that we were planning to do, we made a business determination not to sponsor team members.**

\* \* \*

Q.    (By Mr. Bates) Well, I just want to make sure I understand your testimony correctly, then.  Was it your understanding that there was no process whereby every team member with an ineligible conviction was afforded the option of taking a period of leave in order to attempt to obtain a Section 19 waiver?

**A.    My answer is we never had a team member take leave to get a waiver. I'm not aware of a single time where we had a team member that was on leave seeking a waiver.**

\* \* \*

Q.    My ultimate question is are you aware of any policy whereby every team member who were terminated was given the option of taking leave so that they could apply for a Section 19 waiver if they chose to do so and come back once they were deemed eligible?

34

**A.      That was not our policy.**

Q.      Why wasn't that your policy?

**A.      Again, we made it a business determination early on in our business judgment that we weren't going to sponsor people to – you know, when they were out – sponsor people for waivers.**

Q.      Can you help me understand why that was your business judgment?

**A.      Sure. I believe I shared it earlier, but there's a lot of different factors. We don't know how the FDIC is going to rule on whether somebody – whether they view it as close to de minimis or very serious. We also don't really have any idea how long it takes in order to do that. I believe I also shared with you some team members I believe weren't even interested in it.  So there's a lot of reasons why a team member – either we didn't – we wouldn't know the timing, we wouldn't know the criteria, we wouldn't know the length of time, or we wouldn't even know whether they were interested in doing that.**

DeLanoit Dep. at 136:9–24; 137:15–25; 142:14–143:16, Ex. 47, App. 709–10, 711.

149.      Wells Fargo corporate employee relations consultant Deb Mitchell confirmed the reasons why WFHM team members were not put on leave and why Wells Fargo did not sponsor Section 19 waiver applications:

Q.      (By Mr. Bates) Why wasn't – why wasn't every employee offered the option of taking leave in order to see if they could get an FDIC waiver?

**A.      Well, there were some reasons why we did not adopt that as a – as a practice or a protocol.  The waiver process itself can take anywhere from six to 12 months, and during that time, it is difficult to ask a manager to pay for somebody to be not at work, not producing, but getting full salary.  It's also in a way difficult for the employee to be on an unpaid leave for that length of time and perhaps not be considered eligible for unemployment benefits under certain states' rules of how they administer their programs.**

                    * * *

**So there are those kind of considerations. It's difficult to keep pace in a lot of situations with the workload demands, without being able to replace that person, and if a person is just on a very extended leave, you can't really replace that person because they're still kind of there, if you will.**

> **So there's a variety of reasons why it's very challenging and difficult to just have a person on a very long extended absence like that where** you can't replace them. They're still needing to pay for their medical benefits but may not have pay. So it's just difficult in a number of ways.

* * *

Q.   Did Wells Fargo sponsor anyone's waiver?

**A.   No, not that I'm aware of.**

Q.   Why didn't Wells Fargo sponsor anyone's waiver?

**A.   Again, we had taken a look at that and decided that it was not a workable proposition for us for a number of reasons. One of the more compelling reasons is that if you do it for one, you have to do it for everybody, and we could certainly anticipate that there would be a time, there would be an individual with a type of a record where it did not make sense to sponsor that individual's application and yet we would feel obligated to do so, so in order to be really equitable, we decided not to do it for anybody.**

Q.   You said if you do it for one you should do it for everyone, right?

**A.   Well, that would be the thinking, and, you know, it just was equitable to make that decision – since we didn't want to be tied into facing that situation of having to sponsor somebody who it would be inappropriate to sponsor, that the equitable decision was not to sponsor anybody.**

Q.   Based on that do-it-for-one, do-it-for-everyone line of thinking, would you agree with me that if Wells Fargo offered Richard Eggers the option to take up to six months of leave in order to obtain a Section 19 waiver, then that option should have been afforded to everyone?

**A.   Well, I don't know that I necessarily agree with that. I wasn't the decision-maker on that so I don't know what considerations went into that.**

Mitchell Dep. 174:18–175:6; 176:9–177:16, Ex. 48, App. 717–18.

### M.   *Summary Timeline*

150.   The following timeline, presented graphically at Ex. 53, App. 749–50, as a summary chart prepared pursuant to Fed. R. Evid. 901 and 1006, summarizes the above-referenced undisputed material facts:

36

a.  **1963 –** Eggers' disqualifying crime.  SUMF ¶142.

b.  **1987-2007 –** Plaintiffs' disqualifying crimes.  SUMF ¶¶ 93–101.

c.  **2000-2008 –** Plaintiffs (except Dwann Jones) are hired by Wells Fargo or one of its predecessors.  SUMF ¶¶ 93–100.

d.  **2008 –** Wells Fargo acquired Wachovia, which already conducts fingerprint-based background checks as part of its Section 19 compliance.  SUMF ¶¶26–27.

e.  **July 30, 2008 –** Congress enacted the SAFE Act.  Its regulations effective October 1, 2010, required fingerprinting as part of registration process for mortgage loan originators.  SUMF ¶¶22–24.

f.  **Early 2010 –** Wells Fargo required all new hires to have FBI fingerprint-based criminal background screenings.  SUMF ¶32.

g.  **September 23, 2011 –** HUD issued guidance for FHA approved lenders, including disclosure obligations regarding criminal actions.  SUMF ¶25.

h.  **Late 2011 and 2012 –** WFHM implemented a rescreen project in which WFHM team members would undergo criminal history rescreenings including FBI fingerprint-based checks.  SUMF ¶36.

i.  **January – February 2012 –** Cara Williams, Slaughter, Miller and Teresa Jones are discharged due to Section 19 ineligibility.  SUMF ¶¶93–95, 97.

j.  **April 25, 2012 –** Teresa Jones applies for a Section 19 waiver.  SUMF ¶108.

k.  **May 2012 –** Anthony Williams, Kenyon, Fields-Campbell, and Collier are discharged due to Section 19 ineligibility.  SUMF ¶¶96, 98–100.

l.      **June 2012** – The WFHM rescreen is nearly completed.  SUMF ¶59.

m.      **July 12, 2012** – Eggers is discharged for Section 19 ineligibility.  SUMF

¶142.

n.      **July 18, 2012 –** Slaughter applies for a Section 19 waiver.  SUMF ¶115.

o.      **August 2012 –** Anthony Williams, Teresa Jones, Fields-Campbell, and

Kenyon file administrative charges.  SUMF ¶121.

p.      **August 16, 2012 –** Teresa Jones receives Section 19 waiver from the

FDIC.  SUMF ¶110.

q.      **September 2012** – Cara Williams, Collier, and Miller file administrative

charges.  SUMF ¶121.

r.      **September 5, 2012 –** Anthony Williams receives FDIC correspondence

concerning FDIC opinion that Section 19 does not apply to his specific

attempted burglary conviction. SUMF ¶118.

s.      **October 8, 2012 –** Anthony Williams is reinstated by Wells Fargo.

SUMF ¶119.

t.      **October 22, 2012 –** Teresa Jones is rehired by Wells Fargo.  SUMF ¶113.

u.      **November 2012 –** Slaughter files administrative charge.  SUMF ¶121.

v.      **January 25, 2013 –** Kenyon receives Section 19 waiver from the FDIC,

but does not seek re-employment with Wells Fargo.  SUMF ¶115.

w.      **January 31, 2013 –** Slaughter receives FDIC Section 19 waiver

application from the FDIC, but does not apply for a Section 19 waiver.

SUMF ¶116.

x.  **February 8, 2013 –** Collier receives Section 19 waiver from the FDIC.

SUMF ¶110.

y.  **August 2014** – Dwann Jones applies, receives offer contingent on

background check, and is not hired due to Section 19 ineligibility.  SUMF

¶101.

z.  **November 2014** – Dwann Jones applies, receives offer contingent on

background check, and is not hired due to Section 19 ineligibility.  SUMF

¶101.

aa.  **February 6, 2015** – Dwann Jones files an administrative charge.  SUMF

¶121.

Dated:  February 26, 2016.

**FAEGRE BAKER DANIELS LLP**

/s/ Michael A.  Giudicessi
Michael A.  Giudicessi, *Lead Counsel*
  michael.giudicessi@faegrebd.com
Britt L. Teply
  britt.teply@faegrebd.com
801 Grand Avenue, 33rd Floor
Des Moines, Iowa 50309-8003
Telephone: (515) 248-9000
Facsimile: (515) 248-9010

**ATTORNEYS FOR DEFENDANT**
**WELLS FARGO BANK, N.A.**

**Certificate of Service**

The undersigned certifies that a true copy of the foregoing **Defendant Wells Fargo Bank, N.A.'s Statement of Undisputed Material Facts in Support of Its Motion for Summary Judgment** was served upon the Plaintiff through the Court's CM/ECF filing system on the 26th day of February, 2016.

/s/ Trisha Richey

Copy to:

Thomas Newkirk
  *tnewkirk@newkirklaw.com*
Leonard E. Bates
  *lbates@newkirklaw.com*
Newkirk Zwagerman, P.L.C.

Laura Ho
  *lho@gbdhlegal.com*
James Kan
  *jkan@gbdhlegal.com*
Goldstein, Borgen, Dardarian & Ho

*Attorneys for Plaintiffs*

US.104700987.11