IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| Cara Williams, Johnita Slaughter, Mandre Miller, James Collier, Teresa Jones, Chance Kenyon, Anthony Williams, Dwann Jones and LeRoy Fields-Campbell, individually and on behalf of a putative class of similarly situated individuals, | ) ) ) ) ) ) ) | Case No. 4:15-cv-000038 |
| Plaintiffs, | ) ) | Defendant's Brief in Support of Its Motion for Summary Judgment |
| v. | ) ) | (Oral Argument Requested) |
| Wells Fargo Bank, N.A., | ) ) | |
| Defendant. | ) ) | |

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56(a), Defendant Wells Fargo Bank, N.A. submits this Brief in Support of Its Motion for Summary Judgment.

Wells Fargo's contemporaneously filed Statement of Undisputed Material Facts ("*SUMF*") sets forth the material facts the summary judgment record establishes as undisputed or indisputable.  Wells Fargo's contemporaneously filed Appendix contains the exhibits and evidence comprising the summary judgment record.  Both are incorporated here by this reference.  Citations to Appendix exhibits appear as "*Ex.*" and to Appendix pages as "*App. __.*"

**Table of Contents**

Introduction..................................................................................................................................3

Undisputed Facts and Background...............................................................................................3

Summary Judgment Standard.......................................................................................................7

Argument .....................................................................................................................................8

I. Plaintiffs Do Not Present a Cognizable Race Discrimination Case Because They Were Not Legally Qualified For Employment and Failed To Meet Legitimate Employer Eligibility Expectations .................................................................................................8

 A. Section 19 Rendered the Putative Class Representatives and Members Legally Ineligible To Work for Wells Fargo .........................................................................9

 B. Plaintiffs and Those They Seek To Represent Did Not Meet Legitimate Employer Expectations on Section 19 Eligibility ...................................................................13

 C. Section 19 Bars Plaintiffs' Race Discrimination Claims .......................................13

II. Other Than Their Discharges or Denials of Employment, Plaintiffs Suffered No Adverse Employment Action .....................................................................................................15

III. The Actions Plaintiffs Challenge Were Job-Related and Consistent With Business Necessity as a Matter of Law ....................................................................................19

IV. Wells Fargo Was Not Obligated To Adopt Plaintiffs' Suggested Alternative Practices and Did Not Discriminate Against Them Based on Their Race By Not Doing So .................22

V. Plaintiffs Cannot Establish Pretext or Causation for Race Discrimination Because Wells Fargo's Actions Were Required by Federal Law .............................................................31

 A. Plaintiffs Cannot Show Wells Fargo's Legally-Mandated Actions Were Pretextual ...........................................................................................................31

 B. Plaintiffs Cannot Prove Causation ........................................................................36

VI. Because Plaintiffs Were Not Legally Eligible To Work for Wells Fargo, They Did Not Suffer Injury In Fact and Lack Standing .......................................................................36

Conclusion .............................................................................................................................38

## Introduction

This case rises and falls on whether persons Congress disqualified from working for federally insured depository institutions due to criminal convictions for crimes of dishonesty, breach of trust, money laundering, or certain drug crimes nevertheless may pursue claims based on allegations they were not hired or retained because of race rather than statutory ineligibility.

Specifically, as with the summary judgment motion pending before this Court in the parallel age discrimination case of *Richard Eggers v. Wells Fargo Bank, N.A.*, Case No. 4:14-cv-394 (S.D. Iowa), this dispositive motion advances that 12 U.S.C. § 1829 ("*Section 19*") controls and commands summary judgment for Defendant Wells Fargo Bank, N.A. because that statute alone dictates legal eligibility for federally insured depository institution employment.

Therefore, this Rule 56 motion provides the correct means and the appropriate procedural setting to rule that Section 19 defeats Plaintiffs' Title VII disparate impact and disparate treatment race discrimination claims as a matter of law based on the undisputed material facts.

## Undisputed Facts and Background

Without limiting the facts in its SUMF, Wells Fargo provides the following summary:

**A.      *Section 19's Regulation of Wells Fargo.***

Because the Federal Deposit Insurance Corporation ("*FDIC*") insures Wells Fargo, the company and its employees must satisfy Section 19 of the Federal Deposit Insurance Act and who it defines as qualified to work for a federally insured depository institution.  *See* 12 U.S.C. § 1829.  Section 19 unambiguously bans Wells Fargo from employing "any person who has been convicted of any criminal offense involving dishonesty or a breach of trust or money laundering."  *See id.*  This prohibition operates "as a statutory bar to participation absent the

written consent of the FDIC." *See FDIC Stmt. of Policy for §19 of the FDIA*, 63 Fed. Reg. 66,

177, 184 (Dec. 1, 1988) ("*FDIC Stmt. of Policy*"), Ex. 5, App. 65.

Wells Fargo cannot turn a blind eye to disqualifying convictions.  Rather, all insured

depository institutions must "make reasonable inquiries, pursuant to [Section 19] . . . so as to

avoid hiring or permitting participation in their affairs by persons barred from employment by

federal law."  *Smith v. Bank of Am. Corp.*, 865 F. Supp. 2d 298, 304 (E.D.N.Y. 2012) (citing

*FDIC Stmt. of Policy* at 182–85).  Disqualified individuals and banks face severe sanctions for

knowingly violating Section 19, including fines of up to $1 million per day, five years in prison,

or both.  12 U.S.C. § 1829(b); *Sells-Lawrence v. Chase Manhattan Bank, N.A.*, 2002 WL

31573529, at *3 (D.V.I. Mar. 12, 2002) ("knowingly" standard was met when background check

revealed a disqualifying conviction not disclosed on an employment application, "at which point

[defendant bank] lawfully terminated her employ as mandated by section 1829").

Even if an agency waiver is sought, a disqualified individual "cannot be affiliated with, or

employed by, an insured institution while a Section 19 application is pending with the FDIC."

FDIC Fin. Inst. Ltr., FIL-3-2013 (February 8, 2013), Ex. 6, App. 67.

**B.**     ***Wells Fargo Rescreens Team Members in Response to New Regulatory***
           ***Requirements and a Merger with Wachovia.***

Following a merger with Wachovia and the passage of the Secure and Fair Enforcement

for Mortgage Licensing Act of 2008, 12 U.S.C. § 5101, *et seq.* (the "*SAFE Act*") by Congress,

Wells Fargo re-evaluated its criminal background screening procedures.  SUMF ¶22, 26–34.

The SAFE Act and its implementing regulations required use of fingerprint-based background

checks, which already was the practice at Wachovia.  SUMF ¶¶24, 27.  Wells Fargo thereupon

implemented changes in its screening method to comply with higher market and regulatory

expectations.  SUMF ¶35.

As of March 2010, Wells Fargo required persons receiving contingent offers of employment to pass post-offer FBI fingerprint-based background checks.  SUMF ¶32.  Then, beginning in 2011, its Wells Fargo Home Mortgage division ("*WFHM*") conducted a criminal background rescreen using the new FBI fingerprint-based checks for its existing employees, which Wells Fargo refers to as "team members."  SUMF ¶¶35–36.  WFHM, among other things, made the business judgment that this rescreen would allow it to better manage resources and enable team members to move more easily among different areas of the business.  SUMF ¶38.

Notably, Wells Fargo was not the only FDIC-insured institution evaluating its compliance processes and implementing rescreens.  In November 2012, FDIC Director Sandra L. Thompson explained why the agency was experiencing a surge in Section 19 waiver requests:

> The increase in applications largely resulted from two factors.  First, recent mergers of entities, such as investment firms, into banks have made Section 19 applicable to employees not previously covered.  Second, the Secure and Fair Enforcement for Mortgage Act of 2008 requires insured institutions to perform checks on all mortgage loan originators.  Some insured institutions, after performing the new required background checks, recognized deficiencies in their background check process, and performed new background checks on *all* employees.

SUMF ¶39; FDIC report, *Exec. Sum.*, Nov. 26, 2012 (emphasis in original), Ex. 31, App. 340.

During its 2011–12 rescreen, WFHM completed approximately 31,769 FBI fingerprint-based background checks of current team members.  SUMF ¶60.  Some 4,723 team members had background check results that raised initial questions on employment eligibility.  SUMF ¶ 61.

Wells Fargo's Background Screening Compliance Team ("*BSCT*") then reviewed rescreen results for those 4,723 team members one by one to determine if each employee satisfied federal Section 19 eligibility standards.  SUMF ¶62.  The BSCT review included consideration of the FDIC's then effective Section 19 *de minimis* exceptions (one of which required that no jail time had been served) to see if employment lawfully could continue despite

a conviction for an otherwise prohibited crime.  SUMF ¶62; *see also* 63 Fed. Reg. 66, 184

(listing *de minimis* criteria).  In this individualized review, the BCST used objective Section 19

criteria to produce case-by-case decisions.  SUMF ¶62.

Wells Fargo discharged some 361 WFHM team members based on these individualized

reviews because their rescreen results revealed convictions it believed made each ineligible for

retention under Section 19.  SUMF ¶63.

### C. *Plaintiffs.*

Plaintiffs Cara Williams, Johnita Slaughter, Mandre Miller, James Collier, Teresa Jones,

Chance Kenyon, Anthony Williams, and LeRoy Fields-Campbell were among the group of team

members who had convictions implicating Section 19 compliance that came to light through the

WFHM rescreen.  SUMF ¶¶93–100.  The convictions, among other things, included crimes of

fraud, forgery, and theft.  *Id.*  As Wells Fargo concluded that each did not meet Section 19's

qualification requirements and did not fall within any *de minimis* exception, it terminated his or

her employment.  *Id.*

The remaining Plaintiff, Dwann Jones, submitted several job applications to Wells Fargo

in 2014.  SUMF ¶101.  He was not hired because his post-offer background screenings disclosed

a felony drug distribution crime that made him ineligible under Section 19.  *Id.*

From the point of their disqualifying crimes through the time of discharge, the Plaintiff

team members neither sought nor held FDIC consent to work for a federally insured depository

institution.  SUMF ¶103.  Dwann Jones likewise lacked FDIC consent at the times he applied.

After they were discharged for Section 19 ineligibility, Teresa Jones, Chance Kenyon,

and James Collier sought the FDIC's consent to work at an insured depository institution.

SUMF ¶¶108, 115.  The FDIC granted them waivers.  SUMF ¶¶110, 115.  Teresa Jones and

Collier informed Wells Fargo of their Section 19 waivers and it rehired them.  *See, e.g.*, SUMF ¶ 112–13.  Collier remains an employee today.  Kenyon also sought and received an FDIC waiver, but did not seek reemployment with Wells Fargo.  SUMF ¶115.  Slaughter inquired to the FDIC about the waiver process and received a waiver application form, but did not complete the application materials necessary to secure a Section 19 waiver.  SUMF ¶116.

Anthony Williams also approached the FDIC about obtaining a Section 19 waiver. SUMF ¶117.  An FDIC staff member reviewed the facts underlying his attempted burglary conviction and opined that because it involved an unlawful entry relating to a domestic incident, it was not a crime of dishonesty for which a waiver would be necessary.  SUMF ¶118.  Anthony Williams forwarded that information to Wells Fargo, which reinstated him to his former job with back pay.  SUMF ¶119.  Wells Fargo still employs him today.

### Summary Judgment Standard

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  A "material fact" is one that "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

The burden is on the non-moving party to establish a genuine dispute of material fact and submit "sufficient probative evidence" that would allow a finding in its favor.  *Anda v. Wickes Furniture Co.*, 517 F.2d 526, 531 (8th Cir. 2008).  Evidence is required, not "contentions" or "self-serving allegations."  *Id.*; *Mayer v. Nextel W. Corp.*, 318 F.3d 803, 809 (8th Cir. 2003). "There is no 'discrimination case exception' to the application of summary judgment." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1056 (8th Cir. 2011).

## Argument

Plaintiffs filed their disparate impact and disparate treatment claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and claim to "represent a putative class of minority employees and applicants who were negatively affected by Wells Fargo's use of non-job-related criminal history screenings." Ex. 1, App. 2. They seek to do so as if Section 19 did not make it unlawful for statutorily ineligible persons like Plaintiffs to work at FDIC insured depository institutions such as Wells Fargo. Yet, Section 19 exists and it defeats their claims.

**I.      Plaintiffs Do Not Present a Cognizable Race Discrimination Case Because They Were Not Legally Qualified For Employment and Failed To Meet Legitimate Employer Eligibility Expectations.**

Qualification is an essential element of any Title VII race discrimination claim. Under disparate impact and disparate treatment theories alike, a plaintiff initially must prove he or she was qualified to work in the position at issue. *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 650–51 (1989) (disparate impact Title VII case requires analysis of "qualified persons"); *King v. Allen Memorial Hosp. Corp.*, 2012 WL 6705826, at *11 (N.D. Iowa, Dec. 26, 2012) (Title VII plaintiff "was not qualified for the position and was not disparately impacted"); *Jones v. Reliant Energy-ARKLA*, 336 F.3d 689, 691 (8th Cir. 2003) (disparate treatment Title VII case requires plaintiff to show "she was qualified to perform her job").

Similarly, to establish a cognizable Title VII case, Plaintiffs must show they were subject to an adverse employment action such as a discharge or failure to hire, and if the action they challenge is termination of employment, they must prove they were "meeting the employer's legitimate job expectations." *Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 934 (8th Cir. 2006).

The essential nature of being "qualified" and of meeting employer expectations was reaffirmed by the Eighth Circuit Court of Appeals in *EEOC v. Con-Way Freight, Inc.*, 622 F.3d

933 (8th Cir. 2010).  There, the plaintiff challenged a company policy which "automatically disqualified any candidate with a theft-related conviction on her application or background check."  *Id.* at 935.

Despite noting evidence of racial *animus*, the Eighth Circuit affirmed summary judgment for the company, holding the evidence was insufficient to merit a trial because (a) numerous employees had been disqualified strictly because of their criminal histories, (b) the company did not employ anyone with a disqualifying conviction, and (c) the corporate representative involved "had personally disqualified 'dozens and dozens' of applicants because of their theft-related convictions."  *Id.* at 936.  Thus, the Eighth Circuit found the plaintiff "cannot establish that she was qualified for Con-Way's open position because, as we noted above, a theft-related conviction renders an applicant unqualified for any position with the company."  *Id.* at 938.

The undisputed facts here compel the same result, even more so because federal law set the job eligibility and employer expectations in issue.

> **A.**      ***Section 19 Rendered the Putative Class Representatives and Members Legally Ineligible To Work for Wells Fargo.***

As noted in *Con-Way Freight, Inc.*, employers can set minimum qualification or eligibility requirements for hiring or retention.

So, too, can Congress.

For example, Congress has barred individuals with certain convictions from working in specific fields.  *See, e.g.*, 18 U.S.C. § 1033 (person with a conviction for dishonesty or breach of trust cannot engage in the business of insurance); 46 U.S.C. § 70105(c)(1)(A) (disqualifying individuals convicted of espionage, sedition, treason, or terrorism from port work); *see also* EEOC Office of Legal Counsel, *Consideration of Arrest and Conviction Records in Employ. Decisions*, No. 915.002 (Apr. 25, 2012) (the "*EEOC Guidance*") at § VI.

Section 19 is another Congressional determination on job eligibility and dictates that persons with convictions for crimes of dishonesty, breach of trust, or money laundering cannot work for insured depository institution without the prior written consent of the FDIC. *See* 18 U.S.C. § 1829; *FDIC Stmt. of Policy*, Ex. 5, App. 58–66.

The Government did not reach this determination randomly. Employment of individuals with such convictions "raises concerns about future dishonesty or breach of trust affecting an insured depository institution." *FDIC Advisory Op. No. FDIC-94-26* (Mar. 28, 1991). Those persons may "constitute [] a threat to the safety or soundness of the insured depository institution or the interests of its depositors, or threaten [] to impair public confidence in the insured depository institution." 12 C.F.R. § 308.157 (2016).

Congress also did not place temporal limitations on the vintage of a disqualifying conviction under Section 19. *See FDIC Advisory Op. No. FDIC-94-26* (Mar. 28, 1991). And the importance of Section 19 has not diminished over time. After the 2007–08 financial crisis, the FDIC addressed anew the risk posed by disqualified individuals to the "safety and soundness" and "public confidence" in an FDIC-covered institution. *FDIC Modification to Stmt. of Policy for § 19 of the FDIA*, 77 Fed. Reg. 74,849 (Dec. 18, 2012), Ex. 7, App. 72–76.

Considering this in the context of Plaintiffs' case, it remains axiomatic that to be "qualified" for a job, a person must be legally eligible to work in the position. *E.g. Chaudhry v. Mobil Oil Corp.*, 186 F.3d 502, 504–05 (4th Cir. 1999) ("To be eligible for Title VII protection, a plaintiff must show that he was qualified for employment. . . . [Plaintiff] conceded that he did not have the specific documentation required to become authorized for employment in the United States . . . [and], therefore, was not qualified for employment and is ineligible for Title

VII protection."); *Oxford English Dictionary*, "qualified" (online ed.) ("having the attributes required by law . . . for doing or being something.").

Further, absence of a required qualification is a legitimate, non-discriminatory reason to terminate or deny employment under Title VII.  *See Dixon v. Pulaski Cnty. Spec. Sch. Dist.*, 578 F.3d 862, 868 (8th Cir. 2009) (abrogated on other grounds by *Torgerson*, 643 F.3d at 1056).

This leads to the fundamental, undisputed dispositive fact in this case:  Plaintiffs are part of a group of persons who *ab initio* lacked legal eligibility for employment at Wells Fargo.

Plaintiffs' ineligibility did not result from their race or even an employer policy.  Instead, Section 19, as applied to Plaintiffs' individual conviction records, disqualified them from employment at Wells Fargo just as it now defeats their Title VII claims.

The Third Circuit Court of Appeals dealt with an analogous circumstance in *Makky v. Chertoff*, 541 F.3d 205 (3rd Cir. 2008), in the context of a mixed motive race discrimination case.  In *Makky*, the court affirmed the district court's dismissal, holding a plaintiff cannot make a Title VII case "if there is unchallenged objective evidence that s/he did not possess the minimal qualifications for the position plaintiff sought to obtain or retain."  *Id.* at 215.

In reaching its result, the court noted "a plaintiff who does not possess the objective baseline qualifications to do his/her job will not be entitled to avoid dismissal" and observed "[t]ypically, this minimum requirement will take the form of some type of licensing requirement, such as a medical, law, or pilot's license, or an analogous requirement *measured by an external or independent body rather than the court or the jury*."  *Id.* (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981) (emphasis added)).

The court further acknowledged *Burdine's* proscription that such a standard "will eliminate the 'most common nondiscriminatory reason [ ] for the plaintiff's rejection'—lack of

minimum baseline qualification." *Id.* at 215–16 (stating "[a] security clearance is the minimum requirement needed to hold Makky's position. . . . when Makky's clearance was suspended, he was not qualified on the most basic level to perform his job").

Section 19 stands as an equivalent, externally imposed and independently mandated minimum baseline requirement. Once a person's disqualifying criminal record and Section 19 statutory ineligibility become known, he or she could not be hired or retained as an employee by a federally insured depository institution. *See* 12 U.S.C. § 1829(a). Further, only the FDIC, as an external and independent body, could remove the legal barrier to employment eligibility.

Thus, individuals disqualified by Section 19 lose any right to sue federally insured depository institutions for employment decisions required by federal law. *See Smith*, 865 F. Supp. 2d at 306; *Houser v. Pritzker*, 28 F. Supp. 3d 222, 237 (S.D.N.Y. 2014) (collecting cases discussing why "a Title VII plaintiff must at least demonstrate that he met the minimum qualifications for the position ultimately denied" and deciding the issue on standing grounds, as discussed further in Brief Point VI, below).

Plaintiffs' crimes stood (or in the case of Anthony Williams appeared to stand) as Section 19 disqualifying offenses and did not meet the *de minimis* criteria then applicable. *See* 63 Fed. Reg. 66, 184 (listing *de minimis* criteria); SUMF ¶¶93–101. It is also undisputed that at the time Wells Fargo discharged Plaintiffs, none possessed consent from the FDIC to work for a federally insured depository institution. *See* SUMF ¶103. Therefore, because Plaintiffs cannot establish they were eligible or legally qualified to work for Wells Fargo, as a matter of law they cannot prove a necessary predicate for their Title VII claims.[1]

This alone warrants summary judgment for Wells Fargo.

---

[1] In the case of Anthony Williams, the same result obtains because Wells Fargo honestly and sincerely believed Section 19 rendered him ineligible due to his attempted burglary conviction.

**B.**     ***Plaintiffs and Those They Seek To Represent Did Not Meet Legitimate Employer Expectations on Section 19 Eligibility.***

Because of their ineligibility, Plaintiffs likewise did not meet Wells Fargo's regularly communicated and legitimate expectation that its employees be legally qualified to work for a financial institution.  Wells Fargo indisputably expected that each team member was qualified and eligible under Section 19 for employment as established by the regular communications Wells Fargo made in its offer letters and employee handbook statements.  SUMF ¶¶104–07.

Therefore, because Plaintiffs had what constituted (or appeared to constitute) Section 19 disqualifying convictions and lacked FDIC waivers, they did not—and could not—meet Wells Fargo's reasonable employment eligibility expectations.  This warrants granting summary judgment to Wells Fargo.  *See Twymon*, 462 F.3d at 934; *see also Wright v. Winnebago Indus., Inc.*, 551 F. Supp. 2d 836, 847 (N.D. Iowa 2008) (granting summary judgment where plaintiff "failed to show that he was able to meet [defendant's] legitimate job expectations.").

**C.**     ***Section 19 Bars Plaintiffs' Race Discrimination Claims.***

Section 19 provides a complete defense at law to Plaintiffs' Title VII race discrimination claims.  The EEOC has declared by written interpretation that Title VII does not override federal laws such as Section 19 that "govern the employment of individuals with specific convictions." *EEOC Guidance* § VI.A.  Moreover, consistent with the EEOC Guidance, no Title VII liability against Wells Fargo can be imposed in this case because the company acted in "compliance with other federal laws and/or regulations" and "the act or omission complained of was in good faith, in conformity with, and in reliance on any written interpretation or opinion of the [EEOC]." *Id.* § I; 29 U.S.C. § 2000e-12(b)(1).

Plaintiffs' prior assertions that Title VII expressly or impliedly superseded Section 19 remain without merit.  No conflict between Section 19 and Title VII exists.  As noted, the

EEOC—the agency tasked with interpreting and enforcing Title VII—has construed the two

statutes in harmony. *EEOC Guidance* §§ I, VI(A). That agency determination specifically listed

Section 19 among the federal statutes that exclude individuals with specific types of criminal

convictions from particular jobs or industries and the EEOC concluded, "Title VII does not

preempt these federally imposed restrictions." *Id.* § VI(A).

The EEOC reaffirmed this position in informal guidance specifically addressing the cases

brought by Plaintiffs and Richard Eggers. Ex. 46, App. 703–05. The EEOC's legal counsel

stated:

> Title VII does not prevent employers, including private institutions subject to
> Section 19, from using criminal background checks, as long as they do so without
> discriminating on the basis of race, national origin, or another legally-protected
> characteristic. . . .
>
> While we cannot comment on the specific legal theories . . . in the pending
> litigation, *we can reiterate that the Enforcement Guidance strikes the right
> balance between legitimate workplace safety issues and the imperative to
> eliminate discriminatory employment practices.*

*Id.* (footnotes omitted and emphasis added).

Further, as a matter of statutory interpretation, Section 19 and Title VII are compatible in

language and in practical effect. Section 19 applies narrowly to employment by depository

institutions insured by the FDIC. 12 U.S.C. § 1829(a). Title VII, enacted later, provides a

general prohibition on employment discrimination. Under long-established canons of statutory

interpretation, there is no basis to find Title VII superseded Section 19. *See Ex. Parte Crow

Dog*, 109 U.S. 556, 576 (1883) (explaining statutory canon of *generalia specialibus non

derogant*: "the legislature, having had its attention directed to a special subject, and having

observed all the circumstances of the case and provided for them, does not intend, by a general

enactment afterwards, to derogate from its own act when it makes no special mention of its intention to do so").  This Court should decline to find a conflict where none exists.

Additionally, no case has been located holding that Title VII supersedes Section 19. Plaintiffs' unsupported theory is that Title VII must be grafted onto Section 19 to require FDIC-insured institutions to retain ineligible workers who are members of a protected class and provide them special rights of notice, leave, or waiver application sponsorship.  Imposition of Title VII in this manner would place insured depository institutions in an untenable position where Congress has barred them from employing ineligible persons and imposed penal sanctions for doing so.

As the Fourth Circuit has explained, an employee cannot make out a cognizable Title VII case under circumstances where Congress disqualified that person from employment because imposition of liability under such circumstances would create an unresolvable paradox.  In *Egbuna v. Time-Life Libraries, Inc.*, the court affirmed summary judgment for the employer where the sanctions for employment of unlawful aliens paralleled those of Section 19:

> Given Congress' unequivocal declaration that it is illegal to hire unauthorized aliens and its mandate that employers immediately discharge unauthorized aliens upon discovering their undocumented status we cannot reverse the district court's grant of summary judgment in favor of [defendant].  To do so would *sanction the formation of a statutorily declared illegal relationship [and] expose [defendant] to civil and criminal penalties*.

153 F.3d 184, 187 (4th Cir. 1998) (emphasis added).

The same situation is presented here by Section 19 and warrants the same outcome.

## II.    Other Than Their Discharges or Denials of Employment, Plaintiffs Suffered No Adverse Employment Action.

No less fundamentally, Plaintiffs must establish as an essential element of a Title VII case that they "suffered an adverse employment action."  *Jackman v. Fifth Judicial Dist. Dep't of Corr. Svcs.*, 728 F.3d 800, 804 (8th Cir. 2013).  Though termination and denial of employment

meet this standard, actions that do not result in a "tangible change in working conditions that produce [] a material employment disadvantage" are not cognizable under Title VII. *Sallis v. Univ. of Minn.*, 408 F.3d 470, 476 (8th Cir. 2005); *Spears v. Mo. Dep't of Corr.*, 210 F.3d 850, 853 (8th Cir. 2000) ("minor changes in working conditions that merely inconvenience an employee or alter an employee's work responsibilities do not" establish adverse employment action). Unquestionably, "not everything that makes an employee unhappy is an adverse employment action." *Montandon v. Farmland Indus., Inc.*, 116 F.3d 355, 359 (8th Cir. 1997).

The requirement of adverse employment action comes from Title VII itself, which states only that "[i]t shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's [protected classification]." 42 U.S.C. § 2000e-2.

To the extent Plaintiffs rest their claims on actions other than denial of employment or discharge—such as Wells Fargo's alleged failure to notify them of the FDIC waiver process or its purported refusal to offer leave and sponsorship of FDIC waivers, *see, e.g.*, FAC ¶¶29–30, Ex. 1, App. 4—their allegations do not relate to an adverse employment action. Those omissions do not concern a failure to hire, termination, failure to promote, or any other material employment disadvantage. Therefore, claims based on them do not provide the basis for a viable cause of action under Title VII. *See Rester v. Stephens Media, LLC*, 739 F.3d 1127, 1131 (8th Cir. 2014).

Moreover, the law is clear that neither Section 19 nor Title VII imposed any notification, leave, or sponsorship obligations on Wells Fargo. *See* EEOC Guidance § VI.C (Title VII does "not mandate that an employer seek such waivers"); *Wash. v. Steve*, 2013 WL 6061988, at *3

(E.D. Wisc., Nov. 18, 2013) (stating the defendant bank had no obligation to file a Section 19 application on behalf of the plaintiff).  As such, the alleged failure to do so does not provide Plaintiffs a cause of action against Wells Fargo.  *See id.*; *Gress v. PNC Bank, N.A.*, 100 F. Supp. 2d 289, 294 (E.D. Penn. 2000) (citation omitted) (holding Section 19 does not "create, either expressly or by implication, a private cause of action").

Beyond that, it is dubious whether Wells Fargo could even sponsor waiver requests for *existing* employees because the FDIC application materials and regulations discuss institution-sponsored waivers as pertaining to *prospective* employees.[2]  SUMF ¶67.  This mirrors the agency view that "an individual subject to Section 19 cannot be . . . employed by [] an insured institution while a Section 19 application is pending."  FDIC Fin. Inst. Ltr. FIL-3-2013 (Feb. 8, 2013), Ex. 6, App. 69.

At bottom, any alleged failure to provide notice, leave, or sponsorship is not a cognizable adverse employment action challengeable under Title VII.  Plaintiffs bore their own responsibility to obtain information about the FDIC waiver process, which was readily available on the FDIC's website.  *See* https://www.fdic.gov/regulations/laws/FORMS/section19.html (last visited Feb. 26, 2016).  In that same regard, Plaintiffs had self-sufficiency on whether and when to seek agency consent to work at a federally insured depository institution.

Indeed, each Plaintiff controlled his or her own destiny.  For Example, the facts show: (i) Teresa Jones sought and received a Section 19 waiver shortly after her discharge, SUMF ¶114, (ii) Slaughter obtained a waiver application form from the FDIC, but never submitted it, SUMF

---

[2] The future tense used by the FDIC in listing the essential criteria it considers when reviewing a Section 19 waiver application reinforces that agency consent may be sought for prospective employees only.  *E.g.*, Ex. 36 § II.A(3), App. 437 (requiring assessment of "[t]he position *to be held* . . . by the person") (emphasis added); § II.A(4), App. 437 (requiring assessment of "[t]he amount of influence and control the person *will be able to exercise*") (emphasis added).

¶116, and (iii) no records exist showing Miller and Cara Williams ever pursued Section 19 waivers.  Those facts likewise demonstrate how the "one size fits all" approach to waiver sponsorship as urged by Plaintiffs does not consider individual wishes of disqualified persons or comport with a company's desire to refrain from interfering with the personal choices of applicants or employees.

Further, the summary judgment record shows how pursuit of a Section 19 waiver without employer assistance or sponsorship was eminently possible.  Within 80 days after her February 17, 2012 discharge for Section 19 ineligibility, Teresa Jones:

(a)  Investigated the FDIC waiver process and received responsive, written guidance from the agency on March 26, 2012;

(b)  Assembled 38 pages of materials to submit to the FDIC as part of her Section 19 waiver application, including recommendation letters and personal financial information;

(c)  Composed a consent request letter on April 25, 2012, stating "I am seeking a Blanket waiver pursuant to this law. I am requesting this application and waiver as an Individual with no Bank sponsorship"; and,

(d)  Filed her completed application form with the Kansas City office of the FDIC on May 4, 2012, in which she stated, "I am just asking for another chance to be trusted."

SUMF ¶114.

The FDIC granted Teresa Jones a Section 19 waiver on August 16, 2012.   SUMF ¶110. Once she advised Wells Fargo of that, it rehired her.  SUMF ¶¶112–13.

Accordingly, to the extent Plaintiffs' claims are based on matters other than discharge or a failure to hire (including, for example, their claims centering on notice or an unaccepted offer of leave to Eggers), Plaintiffs cannot establish those omissions constituted an adverse employment action as needed to prove their race discrimination case.  *Jackman*, 728 F.3d at 804.

**III.    The Actions Plaintiffs Challenge Were Job-Related and Consistent With
         Business Necessity as a Matter of Law.**

Even if Plaintiffs could make the requisite baseline showing that they were qualified and

eligible for the positions in issue, their case fails on summary judgment because they challenge

Wells Fargo actions that unquestionably were "job related for the position in question and

consistent with business necessity."  42 U.S.C. § 2000(k)(1)(A)(i); *Griggs v. Duke Power*, 401

U.S. 424, 431 (1971).  The "job related" and "business necessity" standards in Title VII emanate

from *Griggs* and require an employer to demonstrate that the challenged practice has a "manifest

relationship to the employment in question."  Civil Rights Act of 1991, Pub. L. No. 102-166, tit.

I, § 105(b), 105 Stat. 1075; *Griggs*, 401 U.S. at 431.[3]

Although Plaintiffs challenge the use of background screens to discern Section 19

eligibility, the "practice" Plaintiffs challenge is tied inseparably to the policy set by Congress and

the FDIC that any person with a conviction for a crime involving dishonesty, a breach of trust, or

money laundering may not be employed by, or affiliated with, an insured depository institution.

12 U.S.C. § 1829(a).  This federally imposed eligibility qualification incontrovertibly bears a

"manifest relationship" to insured depository institution employment.  *Griggs*, 401 U.S. at 431.

Section 19 instructs that an ineligible person categorically "cannot be . . . employed by

. . . an insured institution" absent written consent by the FDIC.  FDIC Fin. Inst. Ltr. FIL-3-2013

(Feb. 8, 2013), Ex. 6, App. 69.  As a result, it is undeniable Wells Fargo's conduct was related to

federal proscriptions against employing persons with disqualifying convictions.  Here, federal

law imposed an affirmative obligation on Wells Fargo to ensure Section 19 compliance and

---

[3] In codifying the standards of *Griggs*, Congress embraced its holding that Title VII "made [job]
qualifications the controlling factor, so that race, nationality, and sex become irrelevant" and
"'expressly protects the employer's right to insist that any prospective applicant . . . must meet
the applicable job qualifications.'"  401 U.S. at 436 (citation omitted).

exposed it to severe penalties if it failed to do so.  *See, e.g.*, *Smith*, 865 F. Supp. 2d at 304; *FDIC Stmt. of Policy*, 63 Fed. Reg. 66 at 182–85, Ex. 5, App. 63–66; *see also* 18 U.S.C. § 1829(b).

Congress and the FDIC set the law and policy that dispel Plaintiffs' bald assertion that "[n]o substantive link exists between the plaintiffs' past crimes and the risks inherent in the job duties held by Wells Fargo employees."  FAC ¶ 252, Ex. 1, App. 26.  The FDIC notes that in assessing a Section 19 application it looks at if the disqualified person "may constitute a threat to the safety and soundness of the insured institution or the interests of its depositors or threaten to impair public confidence in the insured institution."  *FDIC Stmt. of Policy* § D, Ex. 5, App. 64.

The business need to rely on conviction information in this context is a matter of common knowledge, especially given how industry and even the federal courts use crimes of dishonesty or breach of trust as disqualifiers and grounds to impeach or impugn credibility.  *See, e.g.*, 18 U.S.C. § 1033 (providing that a person convicted of a crime of dishonesty or breach of trust may not engage in the business of insurance); Fed. R. Evid. 609(a)(2) (explaining proof "attacking a witness's character for truthfulness by evidence of a criminal conviction . . . must be admitted if the court can readily determine that establishing the elements of the crime required proving — or the witness's admitting — a dishonest act or false statement").[4]

---

[4] An important aspect of Section 19, like Rule 609, is how it centers on crimes of dishonesty and breach of trust.  Those crimes are in the nature of *crimen falsi*, a substantive classification of criminal law offenses that have a "common form of moral wrongfulness."  Stuart P. Green, *Deceit and the Classification of Crimes: Fed. Rule of Evid.609 (A)(2) and the Origins of Crimen Falsi*, 90 J. CRIM. L. & CRIMINOLOGY 1087, 1093 (1999-2000).  That Congress would impose special limitations on the ability of persons convicted of such crimes to work for federally insured depository institutions that parallel rules adopted by the Supreme Court to require liberal impeachment of witnesses with similar convictions should present no surprise.  By declaring a subset of criminals ineligible for FDIC-insured institution employment, Congress clearly placed the safety and security of depository institutions on the same public interest level the federal judiciary recognized in applying special rules to guard against perjury by or falsehoods from a similar category of witnesses who testify in its courtrooms.

Furthermore, when the "economic . . . risks involved in hiring an unqualified applicant are great, the employer bears a correspondingly lighter burden to show that his employment criteria are job related." *Spurlock v. United Airlines, Inc.*, 475 F.2d 216, 219 (10th Cir. 1972) (discussing airline pilot qualification criteria). By enacting Section 19, *Congress* determined that (i) the economic risks involved in employing individuals with disqualifying convictions is great, (ii) such convictions are related to any position with an insured depository institution, and (iii) individuals with such convictions are therefore *unqualified* for employment. This Congressional determination, embodied in Section 19, serves as a "legitimate business necessity, shielding [defendant] from liability" under Title VII. *Wash.*, 2013 WL 6061988, at *3.

That holding is consistent with judicial recognition that an employer's acts in compliance with federally imposed job eligibility requirements are appropriate, needed business measures. *See, e.g.*, *El v. Se. Penn. Transp. Auth.*, 479 F.3d 232, 248 (3d Cir. 2007) (affirming summary judgment because the record lacked evidence permitting a reasonable juror to find the challenged background check policy was inconsistent with business necessity). Even in the absence of Section 19, use of person's criminal conviction history is a legitimate business practice:

> For many employers, conducting a criminal history or credit record background check on a potential employee is a rational and legitimate component of a reasonable hiring process. The reasons for conducting such checks are obvious. Employers have a clear incentive to avoid hiring employees who have a proven tendency to defraud or steal from their employers, engage in workplace violence, or who otherwise appear to be untrustworthy and unreliable.

*EEOC v. Freeman*, 961 F. Supp. 2d 783 (D. Md. 2013), *aff'd*, 778 F.3d 463 (4th Cir. 2015).

All of this makes clear Wells Fargo, first, had a commercial need to engage in background screens so it could make hiring or retention decisions in conformity with Section 19 and, second, that it did so through narrowly tailored, "job related" measures. This conduct was

lawful,  is not actionable, and no jury question is engendered on the fact Wells Fargo's Section

19 compliance efforts in issue occurred consistent with business necessity.

**IV.     Wells Fargo Was Not Obligated To Adopt Plaintiffs' Suggested Alternative
Practices and Did Not Discriminate Against Them Based on Their Race By
Not Doing So.**

Because Wells Fargo's actions were job-related and consistent with business necessity,

Plaintiffs cannot continue in this lawsuit without first establishing the existence of "an alternative

employment practice" with a lesser disparate impact that Wells Fargo "refuses to adopt."  42

U.S. § 2000e-2(k)(1)(A)(ii); *Ricci v. DeStefano*, 557 U.S. 557, 578 (2009).  "Bare assertions"

regarding the existence, efficacy, or feasibility of alternative practices will not suffice. *Gillespie*

*v. Wisc.*, 771 F.2d. 1035, 1045 (7th Cir. 1985).

Further, even if Plaintiffs' case could reach this fourth stage of proving the statutory

elements for a disparate impact claim, they cannot demonstrate that any purported alternative

employment practice meets *the employer's* business interests.  42 U.S.C. § 2000e-2(k)(1)(A)(ii).

Here, Plaintiffs claim in nothing but a conclusory fashion that "[e]lecting to pursue waivers on

behalf of employees" and "electing to tell employees . . . about how they could pursue waivers

prior to their termination" are "alternative practices that would have had less of an adverse

impact."  *See, e.g.*, FAC ¶ 46, Ex. 1, App. 6.

As a matter of law, however, Plaintiffs' suggested alternatives are not viable, would not

guarantee an FDIC waiver (and eligibility for employment), and on their face do not meet Wells

Fargo's business interests.

Initially, it is important to recall that as to each and every employee and applicant who

was legally disqualified from working for Wells Fargo because of their Section 19 conviction(s),

ineligibility arose from federal law, not an employer practice.  12 U.S.C. § 1829(a); FDIC Fin.

Inst. Ltr., FIL-3-2013 (Feb. 8, 2013), Ex. 6, App. 69.  Further, when examining alternatives to discharge, it remains highly questionable if "suspending" disqualified individuals or placing them on extended leaves of absence—but continuing to employ them—would be lawful.  *Id.*

More importantly, Plaintiffs lack any evidence that across-the-board waiver sponsorship for ineligible workers would be prudent, effective, and an exercise of sound business judgment, especially because the disqualifying crimes typically involve dishonesty or a breach of trust.

The reputation and standing of the financial system and the safety of customer information and deposits stand at the forefront of the FDIC's evaluation of *each* Section 19 waiver application.  By looking at the nature and degree of the criminal convictions of just two of the Wells Fargo team members discharged after the WFHM rescreen, it becomes readily apparent why no insured depository institution would chose to adopt a blanket waiver sponsorship policy absent court mandate and likewise why the FDIC almost certainly would not grant permission for every disqualified team member to work at an insured depository institution.

By way of example, the conviction information of two discharged team members appears at Ex. 33, App. 357–58.  The ineligible worker identified by Process ID 13651941 was discharged once convictions for federal felony bank fraud (with 21 months in jail served) and four different crimes of theft became known.  SUMF ¶64.  Another, identified by Process ID 13784671, was discharged due to Section 19 as a result of two convictions—11 years apart—for felony embezzlement by a fiduciary and aiding and abetting embezzlement.  SUMF ¶65.

Both of these individuals are women, one of whom is African American and the other Caucasian.  Ex. 33, App. 357–58.  Their criminal records, not their race, make clear they should not be selected for leave or sponsorship any more than they would be desirable candidates for retention or reinstatement.

Yet, Plaintiffs argue Title VII should be applied by this Court to require Wells Fargo to (i) provide advance notice of publicly available information concerning the FDIC waiver process to protected class members who have Section 19 disqualifying convictions, (ii) retain those protected class members, but not others, on leaves of absence for indeterminate lengths of time once their Section 19 disqualifying convictions became known and through the time the FDIC approved or denied Section 19 waivers, applications, and (iii) sponsor their applications for Section 19 waivers, which sponsorship, according to the FDIC, would need the approval of Wells Fargo's board of directors or its designee and its fidelity bond insurer.

*To what end?*

- To hire or retain persons convicted for crimes such as federal felony bank fraud and embezzlement in the unlikely event the FDIC granted each and every one of them a Section 19 waiver?

- To place persons convicted of crimes of dishonesty and breach of trust into jobs with access to and responsibility for consumer information and financial accounts?

- To instill public confidence in the financial system?

- To preserve the safety of customer deposits?

In fact, Plaintiffs want this Court to create special rights for them and displace Wells Fargo's business judgment with respect to matters Congress has already spoken on and which otherwise fall into the purview of an employer. A blanket sponsorship, leave, and unstated, but essential, reinstatement obligation inappropriately transfers matters of business judgment to the courts and the convicted from the FDIC and the depository institutions it regulates and insures.

Thus, Plaintiffs' assertion that Title VII required Wells Fargo to extend notices, leaves of absence and/or sponsorship to Section 19 ineligible team members who might fall into a class of persons protected by Title VII, including the employee identified by Process ID 13784671,

simply disrespects the language and purposes of Section 19, a statute the EEOC has recognized as controlling in employment matters involving the use of criminal conviction histories.

Further, the cost of an alleged alternative practice is relevant to the inquiry regarding its viability. *See Watson v. Ft. Worth Bank & Trust*, 487 U.S. 977, 998 (1998) (superseded by statute on other grounds).  To the extent the alternative practices suggested by Plaintiffs involve continuing employment after Wells Fargo learned of a disqualifying conviction, the costs to Wells Fargo were potentially enormous—including fines of up to $1 million per day.  18 U.S.C. § 1829(b).  Further, as discussed below, the expenses Wells Fargo could incur in sponsoring Section 19 waivers for disqualified employees and applicants would be facially unreasonable.

Beyond this, Plaintiffs' claim that Wells Fargo "had the option of obtaining waivers for its applicants and employees" is distorted and factually incorrect.  FAC ¶ 255, Ex. 1, App. 27. Wells Fargo could not assume or guarantee that a request for an FDIC waiver for any ineligible person would be granted by the FDIC regardless of who sought it.  Unless and until a waiver was obtained—which was far from the certainty Plaintiffs appear to claim—Plaintiffs and their putative class could not work at Wells Fargo.  FDIC rep. Nov. 26, 2012, Ex. 31, App. 339–51. Waiver decisions were solely within the discretion of the FDIC, not Wells Fargo.

As a practical matter, Plaintiffs' suggested alternatives are wholly naïve and unworkable. Wells Fargo is not equipped to handle advocacy on behalf of hundreds of team members and countless applicants before an administrative agency, with no guarantee of success, nor should it be required to do so.  To be sure, the nature of such advocacy—delving into details of past criminal convictions and any rehabilitative efforts—would require Wells Fargo to pry into highly personal matters about its employees.  Further, Wells Fargo does not provide employees and applicants with personal legal or strategic advice and no court should compel it to do so.

This point is underscored by the reality of the FDIC waiver process itself.  The amount of work and investigation required illustrates that the suspension and sponsorship obligations Plaintiffs seek to impose are unreasonable as a matter of law.  *See Watson*, 487 U.S. at 998 (stating "[f]actors such as the cost or other burdens of proposed alternative selection devices are relevant in determining whether they would be equally as effective as the challenged practice . . . ."); *Hack v. President & Fellows of Yale College*, 237 F.3d 81, 101 (2d Cir. 2000) ("If plaintiffs have suggested another policy which would serve the defendant's legitimate objectives but would also add significant new costs or create tremendous upheaval or seriously undermine other legitimate objectives, a refusal to accept the alternative will not be viewed as unreasonable.").[5]

The FDIC permits only "two methods by which a [disqualified individual] can apply to the FDIC for written permission" to work for an insured depository institution.  SUMF ¶66.  One involves "an insured depository institution filing a Section 19 application on behalf of a *prospective* director, officer, or employee (Sponsorship)."  SUMF ¶67.  The second method involves an individual completing the waiver application on his or her own.  SUMF ¶68.

The FDIC estimates it takes "16 hours per response" to submit a Section 19 application form, "including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information."  SUMF ¶69.  This requires significant investigation of and access to personal and sensitive information, including the circumstances of the disqualifying crime, the person's rehabilitation efforts, and his or her subsequent reputation.  SUMF ¶70.

---

[5] In assessing the costs and burdens of alternatives, the Supreme Court has cautioned "[c]ourts are generally less competent than employers to restructure business practices," and "the judiciary should proceed with care before mandating that an employer must adopt a plaintiff's [proposed alternative employment policy] in response to a Title VII suit."  *Wards Cove*, 490 U.S. at 661.

For example, Section E of the application requires, among other things, a description of the "nature of the crime," its "disposition," and the "nature of the offense and the circumstances surrounding it" including the "age of the employee at the time of conviction, date of the offense, and any mitigating circumstances."  SUMF ¶71.

The application also seeks confirmatory information on "the extent of rehabilitation of the covered person," which may include "subsequent convictions or lack thereof; employment history after conviction . . . highlighting any demonstrated fiduciary responsibility; [l]etters of reference . . . [and] [c]ommunity service or volunteer work."  It requests contact information for individuals who may "verify evidence of rehabilitation."  SUMF ¶72.[6]

The application further requires financial disclosures about the person the FDIC is considering for a Section 19 waiver, much of which could not be obtained without the participation of the ineligible person, and even in some instances, his or her spouse.  SUMF ¶75.

The FDIC calls for this information so it can assess "the risk to the insured depository institution in the employment of the prospective employee."  SUMF ¶76.  Notably, the first two of the FDIC's nine "essential criteria" in making this determination are:

(1)    The conviction or program entry and the specific nature and circumstances of the covered offense;

(2)    Evidence of rehabilitation including the person's reputation since the conviction or program entry; the person's age at the time of conviction or program entry, and the time which has elapsed since the conviction or program entry;

SUMF ¶77.  This information—"essential" to the FDIC's assessment—is not in the possession of Wells Fargo, which has no knowledge of the "specific nature and circumstances" of an

---

[6] The application also requires "copies of the Indictment, Information, or Complaint and Final Decree of Judgment" and requests "any other pertinent facts relative to the crime which are not disclosed" in these documents.  SUMF ¶74.

individual's disqualifying offense or ready assessments regarding an individual's "rehabilitation" or "reputation since the conviction."  SUMF ¶78.

Even if Wells Fargo could obtain such information, it would require substantial time, expense, and resources to gather it and Wells Fargo would have no way to ensure its veracity—particularly with respect to the "nature and circumstances" of past crimes and an individual's rehabilitation and reputation.  Critically, the risk of providing inaccurate information is substantial—the FDIC states that "[p]roviding false information may be grounds for prosecution . . . and may be punishable by fine or imprisonment."[7]  Ex. 36, App. 398.

These are not the only obstacles and potential pitfalls for a party filing a Section 19 waiver application.  Section C of the application form requires specific notice to, and written assurances from, the insured depository institution's fidelity insurer.  Specifically:

> *The insured depository institution's fidelity insurer is to be notified of all pertinent information regarding the conviction of the prospective employee. Assurances from the fidelity insurer must be obtained, in writing, stating the prospective . . . employee will be covered by the insured depository institution's fidelity bond.*  This application and the information requested herein may be submitted prior to notification of the bonding company; however, the FDIC's consent will be subject to a condition that written assurance of fidelity coverage to the same extent as others in similar positions be obtained by the insured depository institution.

SUMF ¶79 (emphasis in original).  Thus, not only must a sponsoring institution await the approval of the FDIC—which is far from guaranteed—it must seek the approval of its fidelity insurer, which also may never come.  SUMF ¶80.  In addition, sponsorship requires an insured depository institution to certify that its board of directors either delegated to the institution

---

[7] The FDIC makes clear that the biographical and criminal history information provided in a Section 19 application may lead to future arrest or prosecution:  "Should the information [in an application] indicate a violation of law, the application may be referred to any agency responsible for investigating or prosecuting such a violation.  SUMF ¶82.

official signing the application the authority to make Section 19 applications or that the institution's board adopted a resolution authorizing the application.  SUMF ¶81.

The scope of the Section 19 waiver application process illustrates the *per se* unreasonableness of Plaintiffs' proposed alternatives.  This is not a case that challenges a form of mental or physical testing used by an employer to measure potential job performance by measuring reading proficiency of lifting and standing abilities.  *See, e.g.*, *Griggs*, 401 U. S. at 431–32.  Thus, a typical approach to find alternate ways to allow an applicant to show he or she is qualified to perform a job do not apply here.  *See, e.g.*, *Watson*, 487 U. S., at 988 (stating, "[e]ach of our subsequent decisions, however, like *Griggs* itself, involved standardized employment tests or criteria").  Plaintiffs can offer no alternative test or process that would insure Section 19 compliance because so long as a disqualified worker lacks FDIC consent, he or she cannot be employed by a federally insured depository institution.

Moreover, the unreasonableness of compelling employers to file waiver applications is demonstrated, among other things, by the time required to investigate and complete an application, the risk to an insured institution of providing inaccurate information, the lengthy period an application could be pending review, and the fact an application could nonetheless be denied in the sole discretion of the FDIC.  Those factors establish why disparate impact law does not mandate such an alternative.  *See Watson*, 487 U.S. at 998.

Expanding on this, the summary judgment record shows this manifest unreasonableness. Using the FDIC's 16 hour per application time estimate, it would take 5,776 hours, or three persons dedicated full-time to working on Section 19 applications *an entire year*, to process just the initial paperwork necessary to initiate sponsorship of Section 19 applications for the 361 individuals discharged during the WFHM rescreen.  *See* SUMF ¶69.

Therefore, it is unreasonable to (i) expect the FDIC would grant waivers to everyone Section 19 rendered ineligible, (ii) assume each disqualified person wanted an FDIC waiver[8] and/or would assist Wells Fargo by providing the necessary information to obtain one through sponsorship, and (iii) suggest that Wells Fargo must sponsor waiver applications for every disqualified worker or applicant without regard to the nature and gravity of the offense, the number of convictions, or other facts that could adversely affect its business or standing with regulators, customers, or the general public.  Here, Wells Fargo made the business judgment not to seek waivers on behalf of *anyone* after assessing the effort it would take to do so, the risks presented by doing so, and the uncertainties inherent in the process.

Combined, these factors expose Plaintiffs' proposed alternatives as legally unsupportable, facially unreasonable, and burdensome as a matter of law.  *See Sanchez v. City of Santa Ana*, 928 F. Supp. 1494, 1512 (C.D. Cal. 1996) (rejecting plaintiffs' proposed use of assessment centers to judge candidates instead of written exams because "use of an assessment center would require 3–4 hours to evaluate each candidate . . . [and] [u]nder *Wards Cove,* a proposed alternative that represents a substantial financial and time burden does not constitute an equally effective alternative").

Ultimately, providing notice, sponsorship, or leave would not and could not have prevented Plaintiffs' employment terminations without more.  Their discharges were mandated by law, and Plaintiffs have presented no viable manner in which Wells Fargo could alternatively meet its Section 19 obligations.  As noted earlier, sponsorship is not required under Title VII, *see Wash.*, 2013 WL 6061988, at *3, and Section 19 is silent with regard to any notice requirement

---

[8] Plaintiffs exemplify why it cannot be assumed that the notice, leave, or sponsorship alternatives they suggest would or could, without more, reduce any alleged statistical disparate impact, as is required to succeed on such a theory.  Several Plaintiffs never sought or obtained waivers.

notwithstanding Congress's imposition of notice obligations under other federal laws, including

Title VII. *See* 42 U.S. § 2000e-10 (requiring employers to post notice of Title VII rights).

This Court should refrain from imposing such alternatives under the guise of reforming

what a plaintiff might assail as an unwise employer practice implemented to comply with Section

19.  As noted in *King v. Girard Bank*, No. 76-2927, 1978 WL 79 at *5, 17 F.E.P. 131 (E.D.

Penn., Mar. 13, 1978), "[i]t would be anomalous to hold that [defendant] has acted in a

discriminatory fashion by posing the specific question which Congress requires it to ask to avoid

sanctions under banking legislation."

## V.     Plaintiffs Cannot Establish Pretext or Causation for Race Discrimination Because Wells Fargo's Actions Were Required by Federal Law.

Even if Plaintiffs could establish a cognizable case, their Title VII race discrimination

claims fail because they cannot show:  (A) as to their disparate treatment case, that Wells Fargo's

reasons for discharging or denying them employment were pretextual; or (B) a causal connection

between any adverse employment action and their race.  *See, e.g.*, *Shanklin v. Fitzgerald*, 397

F.3d 596, 603–04 (8th Cir. 2007) (granting summary judgment under Title VII where employee

did not show its "proffered reasons were a pretext for unlawful race discrimination" and failed to

"present some evidence, direct or indirect, that she was discharged because of her race").

### A.     *Plaintiffs Cannot Show Wells Fargo's Legally Mandated Actions Were Pretextual.*

Even if Plaintiffs could make a *prima facie* showing of disparate treatment based on race,

that claim fails at the second and third phases of the *McDonnell Douglas* analysis used in such

cases.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973) (*prima facie* case

under disparate treatment theory may be rebutted by a "legitimate nondiscriminatory reason").

First, Wells Fargo has established a legitimate, non-discriminatory reason for its actions: Section 19 mandated that it not employ individuals such as Plaintiffs who had disqualifying convictions and lacked FDIC authorization to work for a federally-insured depository institution.

Beyond that, even though Plaintiffs allege both "individual" disparate treatment and a "pattern-or-practice" claim on behalf of a purported class, both fail because Plaintiffs cannot show a genuine issue of material fact as to Wells Fargo's legitimate, non-discriminatory reasons for the actions they challenge. *See, e.g.*, *Teamsters v. U.S.*, 431 U.S. 324, 360 & n. 46 (1977) (plaintiff's required showing under a pattern-or-practice theory that discrimination was the employer's "standard operating procedure" is rebutted by "a nondiscriminatory reason").

Without question, Section 19 provides an insured depository institution an "extremely strong" legitimate, non-discriminatory reason for refusing to employ an individual with a disqualifying conviction:  namely, the "hefty penalties"—including fines of up to $1,000,000 per day—for employing a disqualified individual. *Wash.,* 2013 WL 6061988, at *3.

As a result, any "presumption of discrimination disappears entirely" and Plaintiffs bear the burden to prove that Wells Fargo's proffered reason "is merely a pretext for discriminatory animus." *Rose-Matson v. NME Hosps.*, 133 F.3d 1104, 1107 (8th Cir. 1998).  Plaintiffs may attempt to prove pretext by showing "that the employer's explanation is 'unworthy of credence' . . . because it has no basis in fact" or "by persuading the court that a [prohibited] reason more likely motivated the employer." *Torgerson*, 643 F.3d at 1047 (quotations omitted).  "Either route amounts to showing that a prohibited reason, rather than the employer's stated reason actually motivated the employer's action." *Id.*  Plaintiffs cannot meet their burden here.

For example, Plaintiffs cannot show similarly-situated persons of a different race were treated more favorably with regard to the adverse employment actions they challenge. *Cherry v.*

*Ritenour Sch. Dist.*, 361 F.3d 474, 479 (8th Cir. 2004) (citations and internal marks omitted)

("Probably the most commonly employed method of demonstrating that an employer's

explanation is pretextual is to show that similarly situated persons of a different race . . . received

more favorable treatment."). The "similarly-situated" requirement is "rigorous" and "the

individuals used for comparison must have dealt with the same supervisor, have been subject to

the same standards, and engaged in the same conduct without any mitigating or distinguishing

circumstances." *EEOC v. Kohler Co.*, 335 F.3d 766, 775 (8th Cir. 2003).

In sum, there is no dispute Wells Fargo discharged *all* WFHM team members whose

rescreen results revealed Section 19 disqualifying convictions, regardless of race. *See* SUMF

¶63. To the extent Plaintiffs challenge actions other than their discharges or denial of

employment, for the reasons outlined above, they are not actionable under Title VII. *See* Brief

Point II. Even if they were, Plaintiffs have not met the "rigorous" burden to show that any

individuals treated differently with respect to notice of the waiver process, the amount of time

between a rescreening and discharge, or an offer of leave were similarly situated.

Second, Plaintiffs cannot show Wells Fargo acted in a subjective, race-based fashion.

*See Torgerson*, 643 F.3d at 1050–51 (observing that even subjectivity, standing alone, cannot

prove pretext). Again, Wells Fargo discharged all ineligible team members, *irrespective of race*.

SUMF ¶63. Wells Fargo similarly made the business decision not to seek a waiver for *any*

employee or applicant. SUMF ¶¶89–92.

Those matters of business judgment are consistent with EEOC guidance and the practice

of other FDIC insured depository institutions. SUMF ¶86. The EEOC acknowledges Title VII

does "not mandate that an employer seek such waivers," and only "where an employer does seek

waivers it must do so in a nondiscriminatory manner." *EEOC Guidance* § VI-C. Wells Fargo's

election not to sponsor Section 19 waivers for anyone provides no evidence of discrimination based on race. *Edmund v. MidAmerican Energy Co.,* 299 F.3d 679, 685–86 (8th Cir. 2002) (cautioning that courts do not sit as "super personnel departments reviewing the wisdom or fairness" of an employer's decisions or how it exercises business judgment).

Third, a Title VII defendant does not have the burden to prove *the absence* of a discriminatory motive for its actions, the plaintiff instead at all times has the burden to show the employer's proffered reason is a pretext for intentional race discrimination. *See EEOC. v. Flasher Co.,* 986 F.2d 1312, 1319 (10th Cir. 1992) (citations omitted). For example, pointing to a mere difference in treatment does not establish a discriminatory intent:

> Title VII does *not* make unexplained differences in treatment per se illegal nor does it make inconsistent or irrational employment practices illegal. It prohibits only intentional discrimination *based upon* an employee's protected class characteristics. Human relationships are inherently complex. Large employers must deal with a multitude of employment decisions, involving different employees, different supervisors, different time periods, and an incredible array of facts that will inevitably differ even among seemingly similar situations . . . .

*Kendrick v. Penske Transp. Servs.*, 220 F.3d 1220, 1232 (10th Cir. 2000) (emphasis in original) (quoting *Flasher*, 986 F.2d at1319–20). "The law does not require, nor could it ever realistically require, employers to treat all of their employees all of the time in all matters with absolute, antiseptic, hindsight equality." *Flasher*, 986 F.2d at 1319.

As the Tenth Circuit Court of Appeals stated, it would be erroneous to assume "differential treatment between a minority employee and a non-minority employee that is not explained by the employer in terms of a rational, predetermined business policy *must* be based on illegal discrimination because of an employee's protected class characteristics" since "[s]uch an assumption is neither correct under the law nor is it an accurate reflection of reality." *Id.* (citation omitted, emphasis in original).

Here, Plaintiffs argue that because Richard Eggers, the Caucasian plaintiff in the parallel Section 19 age discrimination case, received information about the FDIC waiver process from Wells Fargo and the potential for a leave of absence was discussed (but never accepted by him or otherwise effectuated), he received preferential treatment based on his race.  SUMF ¶143.  Even if a failure to provide publicly available information on the Section 19 waiver application process or to discuss a *potential* leave of absence with Plaintiffs prior to discharge could be deemed actionable, no evidence supports Plaintiffs' contention that Eggers was similarly situated, protected from adverse action because he was Caucasian, or that the Plaintiff team members were treated differently because they were African American.  *See, e.g.*, SUMF ¶¶141–48. App. Ex. 52, App. 746–48.

Plaintiffs' assumption that any differences in Wells Fargo's communications with Richard Eggers resulted from intentional race discrimination is unavailing because Eggers is not similarly situated and Plaintiffs lack evidence to rebut Wells Fargo's legitimate, non-discriminatory explanations.  *Flasher*, 986 F.2d at 1319–20.  And, as to the only actionable adverse employment action in this case—termination—Eggers and the Plaintiff team members suffered the same fate as a result of Section 19.

Finally, Wells Fargo's reasons for the adverse employment actions Plaintiffs challenge have remained consistent.  *See Loeb v. Best Buy Co., Inc.*, 537 F.3d 867, 873 (8th Cir. 2009) (pretext may be shown with evidence that "the employer's reason for the termination has changed substantially over time").  Plaintiffs were only given one reason for their discharge or denial of employment:  they were prohibited from working for Wells Fargo because of Section 19.  SUMF ¶¶93–100.  That reason never changed and Plaintiffs can offer no evidence that they, or anyone else affected by operation of Section 19, were given a different reason.

**B.**     ***Plaintiffs Cannot Prove Causation.***

Plaintiffs cannot meet their burden under Title VII to prove that race "was a motivating factor" for the adverse employment actions they challenge.  *See* 42 U.S.C. § 2000e-2(m); *see also Wright v. St. Vincent Health Sys.*, 730 F.3d 732, 739 (8th Cir. 2013) (citation and internal marks omitted) (noting that under the "motivating factor" standard of Title VII, "[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination").  Plaintiffs cannot come forward with any evidence they were discharged or denied employment for a reason other than Section 19.  Plaintiffs can offer no evidence that race played a factor—let alone a motivating one—in the actions challenged.

Even if Plaintiffs could use Title VII as a vehicle to challenge Wells Fargo's alleged failure to provide them notice, leave, or sponsorship of an FDIC waiver application, they can put forth no evidence that such failures were based on race and the product of intentional discrimination because they were African American.  Wells Fargo did not seek waivers on behalf of any employee or applicant and no team member deemed ineligible during the WFHM rescreen was retained on leave while he or she pursued a Section 19 waiver from the FDIC.  SUMF ¶¶145–49.

**VI.     Because Plaintiffs Were Not Legally Eligible To Work for Wells Fargo, They Did Not Suffer Injury In Fact and Lack Standing.**

Article III of the Constitution requires a plaintiff to show he has standing to sue.  U.S. CONST. ART. III, § 2; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. __, 134 S. Ct. 1377, 188 L. Ed. 2d 392 (2014).  A plaintiff carries the burden to prove standing and, in a putative class action such as this, the named plaintiffs must show personal, injury-in-fact standing.  *Lewis v. Casey*, 518 U.S. 343, 357

(1996); *Warth v. Seldin*, 422 U.S. 490, 502 (1975).  Without that, Plaintiffs cannot secure relief for themselves or the purported class.  *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974).

Standing requires Plaintiffs to establish three elements:  (1) a concrete, particularized injury-in-fact; (2) that is fairly traceable to the challenged action of the defendant; and (3) that will be redressed by a favorable decision.  *See Lujan*, 504 U.S. at 560–61; *Houser*, 28 F. Supp. 3d at 236.  Plaintiffs cannot establish the second or third standing elements.

As for the "fairly traceable" requirement, Plaintiffs cannot show their alleged injury was caused by Wells Fargo and was " not the result of the independent action of some third party not before the courts." *Lujan*, 504 U.S. at 560; *Smith v. USDA*, 888 F. Supp. 2d 945, 952 (S.D. Iowa 2012).  Congress and the FDIC, not Wells Fargo, decided Plaintiffs' criminal histories precluded them from working for insured depository institutions.  The denial of employment or continued employment to Plaintiffs occurred because of Wells Fargo's obligation to follow the law.  Using the *Egbuna* court's phrasing, Wells Fargo could not "sanction the formation of a statutorily declared illegal relationship" and "expose [itself] to civil and criminal penalties." *Egbuna*, 153 F.3d at 187.  Further, Wells Fargo lacked the unilateral power to make Plaintiffs eligible for employment under Section 19  Congress vested that discretion in the FDIC, alone.

As for the "redressability" requirement, if this Court enters judgment in favor of Plaintiffs and against Wells Fargo, it would do nothing to change Plaintiffs' legal status as individuals ineligible to work for an insured depository institution.  Plaintiffs do not challenge the constitutionality of Section 19, and they do not sue the proper parties to do so in this action.  A judgment against Wells Fargo in this case would leave it and Plaintiffs in the same position they were in at the time Plaintiffs were discharged or denied employment.

More broadly, the issue of standing is inextricably intertwined with Plaintiffs' Section 19 legally ineligibility.  Many courts have held a plaintiff must be qualified for the position at issue to establish injury-in-fact standing.  *Bates v. United Parcel Serv., Inc.*, 465 F.3d 1069, 1078 (9th Cir. 2006) (standing requires plaintiff to show "he meets the basic job requirements for the desired position"); *Melendez v. Ill. Bell Tel. Co.*, 79 F.3d 661, 668 (7th Cir. 1996) (explaining an unqualified plaintiff "would have no standing to sue . . . for he could not claim that he was injured, much less affected, by the defendant's use of an employment practice with an allegedly disparate impact"); *Coe v. Yellow Freight Sys., Inc.*, 646 F.2d 444, 451 (10th Cir. 1981) (plaintiff must meet position's qualifications to prove standing); *King v. Stanislaus Consol. Fire Protection Dist.*, 985 F. Supp. 1228, 1234 (E.D. Cal. 1997) (ineligible applicant lacks standing to maintain a disparate impact failure to hire case).  Under this precedent, parties who do not "satisfy the eligibility requirements for employment . . . would lack constitutional standing to serve as a named plaintiff in a lawsuit." *Houser*, 28 F. Supp. 3d at 222.

### Conclusion

Section 19 controls in this case.  Congress made policy and law choices in that statute dictating Plaintiffs could not work at Wells Fargo without the prior consent of the FDIC.  Those external and independent policy and law choices alone stripped Plaintiffs of any right to federally insured depository institution employment and demonstrate why the undisputed facts support entry of summary judgment for Wells Fargo.

Dated:  February 26, 2016.                 **FAEGRE BAKER DANIELS LLP**

/s/ Michael A. Giudicessi
Michael A. Giudicessi, *Lead Counsel*
  *michael.giudicessi@faegrebd.com*
Britt L. Teply
  *britt.teply@faegrebd.com*
801 Grand Avenue, 33rd Floor
Des Moines, Iowa 50309-8003
Telephone: (515) 248-9000
Facsimile: (515) 248-9010

**ATTORNEYS FOR DEFENDANT**
**WELLS FARGO BANK, N.A.**

## Certificate of Service

The undersigned certifies that a true copy of the foregoing **Defendant's Brief in Support of Its Motion for Summary Judgment (Oral Argument Requested)** was served upon the Plaintiffs through the Court's CM/ECF filing system on the 26th day of February, 2016.

/s/ Trisha Richey

Copy to:

Thomas A. Newkirk
  *tnewkirk@newkirklaw.com*
Leonard E. Bates
  *lbates@newkirklaw.com*
Newkirk Zwagerman, P.L.C.
Laura Ho
  *lho@gbdhlegal.com*
James Kan
  *jkan@gbdhlegal.com*
Goldstein, Borgen, Dardarian & Ho

ATTORNEYS FOR PLAINTIFFS

US.103819882.25